**MID CONTINENT LIFT & EQUIP-MENT, LLC, Appellant, J. McNeill Pilot Car Service, Cross-Appellant**

v.

**J. MCNEILL PILOT CAR SERVICE, Appellee, Mid Continent Lift & Equipment, LLC, Cross-Appellee**

NO. 03-16-00290-CV

Court of Appeals of Texas, Austin.

Filed: December 15, 2017

Ms. Karen C. Burgess, Richardson + Burgess LLP, 221 W. 6th St., Ste 900, Austin, TX 78701-3445, for Appellee.

Mr. Jadd F. Masso, Strasburger & Price, LLP, 901 Main Street, Suite 6000, Dallas, TX 75202-3729, for Appellant.

Before Justices Puryear, Pemberton, and Field

## OPINION

Bob Pemberton, Justice

This cause presents competing single-issue appeals challenging a final judgment, following a jury trial, that ordered J. McNeill Pilot Car Service to pay property damages, including lost profits, to Mid Continent Lift & Equipment, LLC. McNeill appeals the judgment award of lost profits, urging that sufficient supporting evidence is lacking, while Mid Continent appeals evidentiary and jury-charge rulings that precluded it from recovering on a claim for attorney's fees also. We sustain only McNeill's issue. Accordingly, we will reverse the judgment award of lost profits, render judgment that Mid Continent take nothing on that claim, and affirm the judgment that Mid Continent take nothing on its claim for attorney's fees.

## BACKGROUND

Mid Continent, the claimant, is an Oklahoma-based business that buys, sells, and rents used forklifts chiefly in Oklahoma, Texas, and surrounding states. Its inventory has typically consisted of forklifts having a lift capacity of less than 20,000 pounds. However, in April 2009, Mid Continent invested in a forklift of considerably grander scale—a 2002 Australian-made Omega 54D that weighs 137,000 pounds and has a lift capacity exceeding 110,000

pounds—which it purchased for $255,000, the most expensive forklift in its inventory. But ensuing advertisements by Mid Continent did not elicit a buyer, and its attempts to rent the machine—first directly, then through a Texas-based forklift dealer—were impeded by persistent repair and maintenance issues and did not yield it any profit. Ultimately, in 2012, Mid Continent entered into an arrangement with a Texas-based dealer who specializes in large-capacity forklifts—Clinton Wood—to house the Omega at his business's San Antonio-area yard and market it for rental following additional repairs. Wood also hired a trucking company to arrange transport for the Omega to his yard (the machine was then at a location near McGregor), and it was during this shipment that the underlying litigation arose. While headed southward on I-35 through Austin, the truck driver attempted to pass the load under the Stassney overpass despite having insufficient ground clearance. The ensuing collision damaged both the overpass and the forklift.

Mid Continent subsequently sued the trucking company that Wood had hired, LBJ Fleet Services, Inc., and two entities that had been retained to operate pilot cars in connection with the shipment, cross-appellant McNeill and Gypsy Pilot Car.[1] From the inception of the case, Mid Continent asserted claims for property damages under negligence theories,[2] but eventually added a claim for attorney's fees, under color of Civil Practice and

Remedies Code § 38.001(5),[3] as trial approached.

Mid Continent ultimately settled its claims against LBJ and Gypsy, leaving McNeill as the sole defendant. The case proceeded to trial in February 2016. At trial, McNeill did not contest that its negligence had been a proximate cause of the collision, and the proceedings centered on the respective responsibilities of McNeill versus the two settling defendants and the proper measure and amount of damages. As relevant to the appeals, Mid Continent's claimed damages consisted of reasonable repair costs, plus lost profits that Mid Continent maintains it would have derived from rentals of the Omega through Wood, absent the collision, between the time of the collision (July 2012) and trial (February 2016), a period of approximately 43 months. Upon submission of these issues to the jury, the jury found that the negligence of McNeill, LBJ, and Gypsy had each proximately caused the damage in question, apportioned 22 percent of the responsibility to McNeill,[4] and determined that Mid Continent had incurred $143,349 in repair costs and $80,000 in lost profits.

Mid Continent's claim for attorney's fees did not make it to the jury, however. Prior to and later at trial, McNeill raised evidentiary objections founded on the assertion that Mid Continent had failed to timely designate an expert to testify on attorney's fees or to produce its fee invoices, thereby implicating the automatic exclusion under Rule of Civil Procedure 193.6.[5] The district

1. The Omega's dimensions required LBJ to comply with Texas's regulations governing "oversize" or "overweight" loads, including using pilot cars.

2. Mid Continent also sought exemplary damages predicated on alleged gross negligence, but would non-suit that claim at the beginning of trial.

3. See Tex. Civ. Prac. & Rem. Code § 38.001 ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: ... (5) lost or damaged freight or express.").

4. LBJ was found 65 percent responsible and Gypsy 13 percent.

5. See Tex. R. Civ. P. 193.6(a) ("A party who

court excluded Mid Continent's evidence of attorney's fees at trial and ultimately refused Mid Continent's proposed submission of that claim to the jury.

The net effect of the jury's verdict was that Mid Continent was entitled to recover from McNeill twenty-two percent of the repair costs and lost profits found by the jury, $31,539 and $17,600 respectively, for a total of $49,139 in damages. Based on the jury's verdict, and following application of a $14,500 subrogation right that had been assigned to McNeill, the district court rendered judgment awarding Mid Continent a total of $34,639 from McNeill, plus interest and court costs, and denying it any further relief. The respective appeals followed.

### LOST PROFITS (McNeill's appeal)

At trial, the district court submitted, and the jury awarded, "lost profits, if any, that in reasonable probability [Mid Continent] sustained for the period of time that would have been reasonably required to repair the forklift." "Lost profits" were defined as "the net profits—meaning income from a business activity less the expenses associated with the activity—that Mid Continent would have made on the forklift during the period of time reasonably required to repair the forklift." As Mid Continent presented its theory of recovery at trial, the relevant business activity consisted of anticipated rentals of the Omega through Wood that purportedly would have been

realized, absent the collision, during the 43-month period between the collision and trial, which Mid Continent viewed as the reasonable period of repair. While not appearing to contest on appeal that the jury could have found this 43-month period to be the reasonable period of repair, McNeill urges that Mid Continent failed to present legally sufficient evidence that it incurred lost profits from forgone rentals during that period. We agree with McNeill.[6]

We must sustain a challenge to the legal sufficiency of evidence where (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence for a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the absence of a vital fact.[7] We indulge every reasonable inference from the evidence in favor of the jury's finding, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.[8] And with respect to the sufficiency of evidence supporting an award of lost profits in particular, we are guided by some additional familiar principles.

Although the loss need not be "susceptible to exact calculation,"[9] "lost profits damages can be recovered only when both the fact and amount of damages

---

fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that: (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.").

6. Consequently, we need not reach an alternative challenge by McNeill to the factual sufficiency of this evidence. *See* Tex. R. App. P. 47.1.

7. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex. 2005).

8. *Id.* at 822, 827.

9. *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex. 1992).

is proved with reasonable certainty."[10] "What constitutes reasonably certain evidence of lost profits is a fact intensive determination," but the "common thread running through [the] cases" applying this standard "is the necessity that the claim of lost profits not be hypothetical or hopeful but substantial in the circumstances."[11] As the Texas Supreme Court has recently summarized the governing jurisprudence:

> "[A]nticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated." Indeed, "[t]he law is wisely skeptical of claims of lost profits from untested ventures or in unpredictable circumstances, which in reality are little more than wishful thinking." Although legally sufficient evidence might otherwise establish a breach of contract or tort permitting an award of lost profits, "profits 'not susceptible of being established by proof to that degree of certainty which the law demands' cannot be recovered as damages." When the evidence supporting a claim for lost profits damages is largely speculative or a mere hope for success, lost profits have not been established with reasonable certainty.[12]

Similarly, proof of lost profits must be made with "competent evidence" and, "[a]s a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.[13] And while these principles do not mandate any specific accounting or mathematical methodology for determining lost profits with a reasonable certainty, the determination "must be predicated on one complete calculation."[14] Finally, lost profits, by definition, must be *profits*—the net of income or revenues from a business activity less the expenses incurred in that activity[15]—as the jury was appropriately instructed.

██ Mid Continent's shortfalls in attempting to meet these standards begin with the state of its witness arsenal at trial. Although Mid Continent had designated additional witnesses as supportive experts, successful pretrial challenges by McNeill to the reliability or competence of their opinions relegated Mid Continent to relying on two witnesses in attempting to prove lost profits: (1) Matt Rogers, Mid Continent's president, general manager, and majority owner,[16] who was presented as a lay witness with respect to lost profits; and (2) Clinton Wood, whom Mid Continent presented via video deposition as a "non-retained" expert with knowledge regarding rental of large-capacity forklifts, his business specialty.[17] Further complicat-

10. *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 860 (Tex. 2017) (citing *Heine*, 835 S.W.2d at 85).

11. *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 279 (Tex. 2015).

12. *Horizon Health Corp.*, 520 S.W.3d at 860 (quoting *Phillips*, 475 S.W.3d at 280; *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994) (quoting *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098 (1938))).

13. *Heine*, 835 S.W.2d at 84.

14. *Id.* at 85.

15. *See id.* at 83 n.1, 84.

16. The remaining interests were held by Rogers's parents.

17. Wood elaborated that his business—the aptly named Large Lift Trucks, Inc.—traded in forklifts ranging from 20,000 to 120,000 pounds in lift capacity. Summarizing his professional background, Wood added, "All I've ever done is work on big, big forklifts my whole life."

ing matters for Mid Continent, Wood gave testimony tending to undermine its lost-profits claim.

Mid Continent's evidence of lost profits fell into two basic categories: (1) retrospective evidence regarding the Omega's history and attempts to rent it prior to the collision; and (2) evidence concerning the prospect of future rentals of the Omega from the time of the collision looking forward. Within the former category, Rogers recounted that he had purchased the Omega—which, again, was from the 2002 model year—in April 2009, acquiring it through an agent or middleman who was representing a Houston-area owner. At the time, the Omega had 8,800 prior operating hours. Rogers acknowledged that he bought the Omega—at $255,000, the most expensive forklift he had ever purchased—sight unseen and without inquiring into the machine's repair records or maintenance history. (In fact, Rogers also admitted, neither he nor any other Mid Continent employee ultimately ever viewed the Omega in person until after the collision). Instead, Rogers explained, he had relied on the seller's agent to "check the forklift over." While Rogers insisted that he trusted the agent, with whom he had frequently done business, and that his level of purchasing diligence was not unusual, Wood disagreed that these actions were prudent and indicated that he would have performed a personal inspection first.

Following the purchase, as Rogers further recounted, Mid Continent had advertised the Omega for sale or rent, but found no takers. After roughly a year of such efforts, Mid Continent had hired a Houston-area forklift dealer, Ranger Lift Trucks and Finance LLC, to seek rentals with end users. Ranger succeeded in securing a rental customer, Signal International, a marine construction firm. In the meantime, as Rogers acknowledged, the Omega had remained at the prior owner's facility and without maintenance, and Mid Continent incurred approximately $11,500 in repairs and servicing deemed necessary before Signal could use the machine, including replacing oil, battery, and the tires. Thereafter, Signal paid Ranger $13,000 for monthly rentals during May 2010 and $14,000 during June 2010. However, in July, in the words of Ranger correspondence in evidence, Ranger and Mid Continent "lost the rental when the unit went down," specifically encountering problems with the Omega's braking system.

There followed several months of delays as Mid Continent attempted to obtain the necessary parts to repair the Australian-made machine. Eventually, Mid Continent expended just over $16,000 on parts, and Ranger concluded repairs—minus replacing two high-pressure seals on an axle that Rogers had been unable to obtain, but hoped to complete later—in January 2011, then shipped the Omega to Ranger's Houston-area yard.

At this juncture, according to Wood, it happened that he had seen the Omega while dropping by Ranger's yard one day (by all accounts, forklift sales and rentals is a niche industry in which participants tend to know each other and their respective dealings). Wood testified that he had noticed the Omega's axle leaking and was advised by Ranger personnel that "the brakes were bad on it." [18] Wood further recalled his perceptions that the Omega was "a piece of junk" and that, upon ascertaining the price Rogers had paid to buy it, Rogers had been "duped."

---

18. Mid Continent did not preserve objections to this and other hearsay that came into evidence through Wood's testimony.

No further rentals of the Omega through Ranger ensued until the first half of 2012, when Ranger secured a rental customer in the McGregor area. There was no evidence of the specific terms of this rental, and Rogers denied knowing the events that ensued. Wood, however, testified without objection that he heard from a Ranger employee that the rental had, as with the earlier one, failed because of a mechanical breakdown.

All told, Rogers admitted, Mid Continent never made any profit from renting the Omega prior to the collision, whether through the two rentals with Ranger or Mid Continent's own efforts. Following the abortive McGregor rental, Rogers had turned to Wood as an alternative to Ranger, which is what led to the Omega's fateful trip through Austin. Wood denied that he had any definitive business "deal" with Mid Continent as of the time of the collision aside from trying to help Rogers—he indicated that he "felt sorry for Matt" for "getting a bad deal" on the Omega—by moving the machine from the McGregor location to his business's yard and marketing it for rental. Rogers, similarly, acknowledged he and Wood "didn't have any written agreement" and were "going to hash out more details" after the Omega arrived at the yard. But Rogers elaborated that the pair had discussed some general parameters of their arrangement over the telephone, including that Mid Continent would pay Wood to make necessary repairs and "get [the Omega] dressed up" with paint and decals and "ready for rental." Although Rogers did not quantify the cost of these anticipated repairs, Wood opined that they would entail work on the Omega's axle and run approximately $30,000 to $35,000. Following these re-

pairs, Rogers continued, Wood "was going to be looking for customers to rent the forklift to," in return for which "we [had] just roughly talked that [Wood] would get around $3,000 a month for finding a customer and renting out this forklift." Rogers "would get the rest" of the rental revenues, he further claimed, "and I'd have to pay my maintenance costs out of that."

As for the prospect that any such rentals would actually occur, it is undisputed that neither Wood nor Mid Continent had actually secured any rentals or specific rental prospects as of the time of the collision. Likewise, neither Rogers nor Wood attempted to identify or quantify the number, duration, or frequency of future rentals that the Omega would in reasonable probability have obtained during the ensuing 43-month period. On the contrary, Rogers acknowledged that "I really have no way of knowing how long [the Omega] would go out with respect to the consistency" of rentals, although he insisted that "[i]t really just takes one good rental coming along" to bring in "some good money for the company." Similarly, while appearing to acknowledge a likelihood that *some* rentals would have followed repairs and that the market rate would range between $10,000 and $18,000 per month, depending on the duration of the rental, Wood testified that it was "impossible" to estimate how often or long the Omega could be rented, and specifically denied that the Omega could have been rented for the entirety of the 43-month period. Wood elaborated that the Omega's capacity placed it in a "super specialty" market in which "there might be ten people in the country that will rent a machine that size at any given time." [19] Conversely, Wood

---

**19.** In this regard, Wood also observed that the already-limited number of prospective users of such a large machine would often find it

more cost-effective to purchase rather than rent.

explained, "there's probably five of us in the country" who rented to this large-forklift market, that these competitors "fight" for the few available rentals, and that it might take several months or even a year before any rental opportunity came along.

A further impediment to rental prospects was an admitted willingness by Wood to undercut Mid Continent. Wood divulged that if he had secured a "12-to-15 thousand-dollar-a-month [rental] deal for a year" on the Omega, he would, "as soon as I can find one, ... buy a machine and replace [the Omega], and have my machine rented" instead. When confronted with Wood's testimony, Rogers indicated that he no longer trusted Wood, deeming him "shady," but declined to "speculate" as to any alternative means through which he could have attempted to rent the Omega in that event.

As Mid Continent acknowledges, it did not elicit from either Rogers or Wood a definitive calculation, estimate, or opinion as to the amount of net profits it would have obtained from renting the Omega during the relevant 43-month period. Instead, Mid Continent insists that the foregoing evidence supplied the jury with sufficient data or inputs to make a "simple calculation" itself to determine Mid Continent's lost profits—"multiply the monthly rental rate for the forklift (R) times the number of reasonably expected monthly rentals (M), and then subtract any maintenance expenses or other rental costs (E)," or "(R x M) - E = LP." Assuming the validity of Mid Continent's approach, McNeill does not dispute that Mid Continent presented legally sufficient evidence of a monthly rate that the Omega probably would have obtained to the extent it was rented during the relevant time period— Wood opined that the machine would have garnered anywhere between $10,000 and $18,000 per month depending on the rental's duration. Further, as Mid Continent emphasizes, the Omega had in fact been rented, through Ranger, for a monthly rate of $13,000 and $14,000, respectively, in May and June 2010. While these rentals occurred roughly three to five years before the relevant time period, the rates were nonetheless within Wood's range. But the remaining variables in the equation are more problematic for Mid Continent.

For Mid Continent's proposed calculation to support the jury's award of lost profits, it is necessary to indulge in the following additional inferences that Mid Continent urges or assumes:

- Despite the Omega's acknowledged history of mechanical breakdowns that had contributed to sporadic and unprofitable prior rental activity, the anticipated repairs to the axle at Wood's facility would put an end to such interruptions.

- Similarly, Mid Continent's expenditures on these repairs and previous ones, such as brakes and tires, would be "one-time" fixes that would not recur.

- Wood would have assisted Mid Continent in marketing the Omega for rental during the entire 43-month period at issue, or for at least some time period sufficient to generate net profits from rentals for that period.

- Although there was no direct proof of the frequency or duration of prospective rentals through Wood and no actual rentals or even prospects had been secured as of the time of the collision, "a rental—for at least some time period—was almost certain" given the acknowledged existence of an established rental market for large-capacity forklifts, however specialized and competitive, and the fact that Mid Continent

had previously obtained two rentals through Ranger.

- While Wood testified that he would have undercut any such rentals if the duration had made it cost-effective for him to buy a competing large-capacity forklift, Mid Continent nonetheless "would have received all of the shorter-term rentals and, at the very least on a long-term rental, Mid Continent would have several months of rentals while Wood located and purchased a new forklift."

- Wood's commission would have turned out to be near the $3,000 per-month amount that Rogers and Wood purportedly had discussed.

- Although neither Rogers nor Wood quantified the additional costs of ongoing routine maintenance for which Mid Continent would be responsible, any such costs would be consistent with Mid Continent's prior expenditures or would not be in any amounts that would be material to the lost-profit calculation.

In turn, Mid Continent maintains that the jury reasonably could have inferred from the evidence that the Omega would have rented for *some* amount of time within the 43-month period that would, assuming

Wood's $10,000 to $18,000 per-month rental rate, yield Mid Continent revenues exceeding expenses by at least $80,000, thereby supporting the amount of lost profits the jury awarded, or would at least yield net profits greater than zero so as to support some award.[20]

On the contrary, the chain of inferences required to support any award of lost profits here requires speculation at multiple levels—indeed, proof to support several of the component inferences is wholly lacking.[21] Consequently, Mid Continent's proof falls below the "reasonable certainty" of lost-profits damages required under the controlling jurisprudence.[22] We sustain McNeill's issue.

## ATTORNEY'S FEES (Mid Continent's appeal)

We now turn to Mid Continent's appeal challenging the district court's exclusion of its attorney's-fees evidence and subsequent refusal to submit that claim to the jury. Some additional procedural history provides the context for Mid Continent's specific contentions.

Early in the case, McNeill had served Mid Continent with Rule 194 requests for disclosure, including those requiring "des-

---

**20.** *See ERI Consulting Engr's, Inc. v. Swinnea,* 318 S.W.3d 867, 877 (Tex. 2010) (distinguishing failure to prove any amount of lost profits with reasonable certainty, which defeats recovery entirely, from proving some amount of lost profits with reasonable certainty that is less than the full amount awarded, which requires remand (citing *Texas Instruments, Inc.,* 877 S.W.2d at 279; *Southwest Battery Corp.,* 115 S.W.2d at 1099)).

**21.** E.g., the nature of the Omega's future or ongoing maintenance and repair needs, the costs of such services, how long it would have taken Wood to secure a competing forklift, or the probable duration of Wood's arrangement with Mid Continent.

**22.** *See, e.g., Horizon Health Corp.,* 520 S.W.3d at 862-64 (evidence legally insufficient to support award of lost profits where, *inter alia,* estimates regarding duration of allegedly lost business were "too speculative to constitute competent evidence" and there was no evidence regarding the profitability of the particular contracts that allegedly were lost); *Holt Atherton,* 835 S.W.2d at 84-85 (evidence of lost profits legally insufficient where underlying assumptions regarding extent of bulldozer company's lost business were not supported; owner "was not able to specify which contracts they lost, how many they lost, [or] how much profit they would have had from the contracts"); *id.* at 85 ("Recovery of lost profits must be predicated on one complete calculation.").

ignation" of testifying expert witnesses (i.e., providing the information specified under Rule 194.2(f)).[23] In late August 2015, the parties had agreed to, and the district court had signed, a scheduling order that set a trial date of December 14, 2015 and imposed interim deadlines that included a September 21, 2015 deadline for Mid Continent "to designate experts and produce reports in accordance with Tex. R. Civ. P. 194.2(f) and 195.5,"[24] a November 20 discovery-period cut-off, and a November 30 deadline to file amended or supplemental pleadings.[25] Although trial was ultimately reset until the following February 22 (and went forward at that time), the district court never modified any of the order's other deadlines. Nor has Mid Continent preserved any challenge to those deadlines on appeal.

Mid Continent first asserted a claim for attorney's fees through an amended petition filed on November 23, 2015. This amended pleading, including the newly added attorney's-fee claim, was *in itself* unquestionably timely—it preceded the scheduling order's deadline for pleading amendments by one week. The root of Mid Continent's trial-level difficulties, rather, lies in the substantive proof requirements for it to recover on that claim—it was required to present expert testimony to prove up its attorney's fees as reasonable and necessary[26]—and the state of its disclosure responses as of the time of the amendment—while designating experts on other subjects, it did not identify or designate any attorney's-fees expert. And at that juncture, Mid Continent was already two months beyond the scheduling order's September 21 deadline for it "to designate experts and produce reports in accordance with Tex. R. Civ. P. 194.2(f) and 195.5."

On the day following its pleading amendment, November 24, Mid Continent purported to amend its disclosure responses to identify two experts on attorney's fees—its trial counsel, Justin Melkus, then of the Strasburger & Price firm, plus a Strasburger colleague, attorney Robert (Bob) O'Boyle. On the same day, Mid Continent also produced its fee invoices, which it had not previously done. McNeill contested the timeliness of the designation, emphasizing that the expert-designation deadline had

---

**23.** *See* Tex. R. Civ. P. 194.2(f) (requiring disclosure of each testifying expert's name and contact information, subject matter of testimony, "general substance of the expert's mental impressions and opinions and a brief summary of the basis for them," and, with respect to experts under control of responding party, current resume and biography and "all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony"), 195.1 (prescribing that Rule 194 disclosures and depositions are sole means of obtaining discovery concerning testifying experts); *see also id.* R. 195.2 (explaining that "designate experts" is synonymous with "furnish information requested under Rule 194.2(f)").

**24.** *See id.* R. 194.2(f) (the aforementioned disclosures concerning testifying experts), 195.5

(authorizing trial court to order expert's "discoverable factual observations, tests, supporting data, calculations, photographs, or opinions" to be reduced to tangible form, if not previously recorded and reduced to tangible form, and produced).

**25.** *See id.* R. 166 (authorizing scheduling orders), 190.4 & cmt. 7 (authorizing "Level 3" (court-ordered) discovery control plans that may address any matter listed in Rule 166, and must specify a trial date or date for trial-setting conference; the discovery period; deadlines for joining additional parties, amending or supplementing pleadings, and designating expert witnesses; and "appropriate limits on discovery").

**26.** *See, e.g., Woollett v. Matyastik,* 23 S.W.3d 48, 52 (Tex. App.—Austin 2000, pet. denied) ("Expert testimony is required to support an award of attorney's fees.").

expired on September 21 and that discovery had also closed on November 20. Accordingly, McNeill sought exclusion of Mid Continent's expert and evidence on attorney's fees under Rule 193.6. In response, the district court barred Mid Continent from presenting evidence of its attorney's fees at trial, first *in limine* and ultimately through a final ruling following a Mid Continent offer of proof that consisted solely of O'Boyle's prospective testimony.[27]

At least on appeal, Mid Continent does not dispute that its November 24 designation of attorney's-fee experts was untimely, indeed over two months beyond the deadline prescribed in the agreed scheduling order. Consequently, as Mid Continent seems to acknowledge, Rule 193.6 barred admission of its attorney's-fees evidence absent a finding by the district court either that "there was good cause for the failure to timely make, amend, or supple-

ment the discovery response" or that "the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties."[28] As the proponent of the evidence, Mid Continent bore the burden of establishing good cause or the lack of unfair surprise and unfair prejudice,[29] and any such finding "must be supported by the record."[30]

Mid Continent's issue challenges the failure of the district court to find that Mid Continent's untimely designation would not unfairly surprise and unfairly prejudice McNeill, a determination that the parties agree was implicit in the district court's ruling excluding Mid Continent's attorney's-fees evidence.[31] The determination of whether Mid Continent met its burden to negate unfair surprise and unfair prejudice is committed to the district court's discretion,[32] and we ac-

27. The proffered testimony included O'Boyle's opinion that Mid Continent had incurred over $250,000 in reasonable and necessary attorney's fees at the trial level.

28. Tex. R. Civ. P. 193.6(a).

29. *Id.* R. 193.6(b).

30. *Id.*

31. However, we can find no indication in the appellate record that Mid Continent ever explicitly invoked or purported to prove the Rule 193.6 exceptions below. Its focus, as far as can be discerned from the record before us, was instead to argue that the Rule 193.6 exclusion was inapplicable in the first instance because the November 24 disclosures were timely or because McNeill's proper remedy was to move to reopen the discovery period under Rule 190.5. *See id.* R. 190.5 (requiring trial court to allow additional discovery if new, amended, or supplemental pleadings are filed after or so near end of discovery period as to deprive the adverse party of an "adequate opportunity to conduct discovery related to the new matters" and "the adverse party would be unfairly prejudiced without such additional discovery").

But McNeill has not disputed that Mid Continent preserved its lack-of-surprise and lack-of-prejudice arguments for appeal, so we have assumed that it did, as we ultimately reject the arguments in any event.

Subsection (c) of Rule 193.6 afforded the district court an alternative to automatic exclusion upon its failure to find good cause or unfair surprise and unfair prejudice—allow the late disclosures, permit responsive discovery as warranted, and continue or temporarily postpone for that purpose. *See id.* R. 193.6(c). Mid Continent has preserved no complaint with any implicit decision by the district court to forego this option once it had impliedly failed to find unfair surprise or unfair prejudice. However, as discussed below, Mid Continent does seem to view subsection (c) as a factor in the preceding determination of whether unfair surprise and unfair prejudice was lacking.

32. *See, e.g., Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 914 (Tex. 1992) (under predecessor rule, observing that "[t]he trial court has discretion to determine whether the offering party has met his burden of showing good cause to admit the testimony; but the trial court has no discretion to admit testimony

cordingly review it for an abuse of that discretion.[33] The general test for abuse of discretion is whether the trial court acted without regard to any guiding rules or principles.[34] This occurs when either (1) the trial court fails to analyze or apply the law correctly, or (2) with regard to factual issues or matters committed to its discretion, the trial court could reasonably have reached only one decision and failed to do so.[35] Consequently, a trial court does not abuse its discretion when it bases its decision on conflicting evidence, as long as some evidence in the record supports the trial court's decision.[36] Nor is an abuse of discretion demonstrated by "[t]he mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance." [37]

In this regard, the concepts of "surprise" and "prejudice" that the district court was charged with applying, or more precisely the concepts of *"unfair* surprise" and *"unfair* prejudice" to which Rule 193.6 actually refers, contemplate not merely factual inquiry but also a degree of judgment or weighing that is informed by the underlying purposes of Rule 193.6's automatic exclusion and the Texas discovery rules as a whole.[38] These purposes include ensuring that parties receive notice of the witnesses and evidence their opponents intend to present at trial, thereby promoting realistic assessment of settlement prospects and preventing "trial by ambush." [39]

excluded by the rule without a showing of good cause"); *Ersek v. Davis & Davis, P.C.,* 69 S.W.3d 268, 269, 271-72 (Tex. App.—Austin 2002, pet. denied) (recognizing that same was true regarding trial court determinations concerning absence of unfair surprise or unfair prejudice under current Rule 193.6 (citing *Alvarado,* 830 S.W.2d at 914)).

**33.** *See, e.g., Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater,* 285 S.W.3d 879, 881 (Tex. 2009) (per curiam) ("'A trial court's exclusion of an expert who has not been properly designated can be overturned only upon a finding of abuse of discretion.'" (quoting *Mentis v. Barnard,* 870 S.W.2d 14, 16 (Tex. 1994))).

**34.** *See, e.g., Cire v. Cummings,* 134 S.W.3d 835, 838-39 (Tex. 2004).

**35.** *See Walker v. Packer,* 827 S.W.2d 833, 839-40 (Tex. 1992) (orig. proceeding).

**36.** *See Unifund CCR Partners. v. Villa,* 299 S.W.3d 92, 97 (Tex. 2009).

**37.** *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985).

**38.** *See, e.g., Alvarado,* 830 S.W.2d at 914 (looking to "salutary purpose[s]" of Rule 193.6's predecessor rule when applying good-

cause exception); *Ersek,* 69 S.W.3d at 272, 274 (citing underlying policies of discovery rules when applying unfair-surprise and unfair-prejudice exception); *Best Indus. Uniform Supply Co. v. Gulf Alloy Welding, Inc.,* 41 S.W.3d 145, 147 (Tex. App.—Amarillo 2000, pet. denied) (same).

**39.** *See, e.g., Alvarado,* 830 S.W.2d 914 (observing, in context of applying good-cause exception, that "[t]he salutary purpose of [Rule 193.6(a)'s predecessor] is to require complete responses to discovery so as to promote responsible assessment of settlement and prevent trial by ambush"); *Ersek,* 69 S.W.3d at 272 (observing, in regard to whether proponent had negated unfair surprise or unfair prejudice from his failure to designate expert timely, "A party is entitled to prepare for trial assured that a witness will not be called because opposing counsel has not identified him or her in response to a proper interrogatory." (quoting *Alvarado,* 830 S.W.2d at 915)); *id.* at 274 (adding that "[t]he first goal [of the discovery rules] is to provide parties with notice of the evidence that the opposing party intends to present. For example, in the case of witnesses, the discovery process insures that a witness will not be called when the opposing party has not previously identified the witness.... The second goal of the discovery process is to prevent trial by ambush. In other words, the trial

A related underlying policy, emphasized in the current (1999) version of the Texas discovery rules, is that these disclosures should generally be completed within fixed and clear deadlines that precede, but operate independently of, any trial date.[40]

On appeal, Mid Continent relies on events reflected in the clerk's record that, in its view, left the district court no discretion but to find that Mid Continent's untimely designation of attorney's-fees experts would not unfairly surprise and unfairly prejudice McNeill. Mid Continent first insists that McNeill could not have been unfairly surprised and unfairly prejudiced by its late designation because Mid Continent had previously identified an attorney's-fees expert in disclosure responses it had made throughout the case. Mid Continent points out that in its original disclosure responses, dated June 2014, it had identified a fee expert—Melkus, its trial counsel, one of the two Strasburger attorneys whom Mid Continent would later name in its November 24, 2015 disclosures. This original response had thereafter remained unchanged until September 21, 2015—the scheduling order's expert-designation deadline—when Mid Continent amended its disclosure responses to list a

different Strasburger attorney in lieu of Melkos, Christopher Ward.

Mid Continent acknowledges that it had subsequently amended its disclosure responses again to omit any identification or designation of an attorney's-fees expert. That amendment occurred on November 12, 2015, and yielded the version in effect when Mid Continent first added its fee claim through the pleading amendment made on November 23. But Mid Continent downplays the significance of that disclosure amendment, emphasizing that it reversed course less than two weeks later by asserting its fee claim and designating Melkus and O'Boyle as fee experts. All told, Mid Continent urges, it "had a Strasburger attorney designated as a fee expert for almost a year and a half before the September 21, 2015 designation deadline" (Melkos), then designated a second Strasburger attorney (Ward) until early November, so "McNeill could not have been unfairly surprised that Mid Continent would have a Strasburger attorney testify as its attorney's fee expert" (O'Boyle). Nor should its addition of the underlying fee claim come as a surprise, Mid Continent insists, because McNeill had agreed to a

should be based upon the merits of the parties' claims and defenses, rather than an advantage obtained by one side through a surprise attack." (citing *Best Indus. Uniform Supply Co.*, 41 S.W.3d at 147)).

40. *See* Tex. R. Civ. P. 190.1-.4 ("discovery control plan" requirements), 195.2 (general expert-designation deadlines); *Ersek*, 69 S.W.3d at 272 (observing, in context of analyzing unfair surprise and unfair prejudice from late expert designation, that these and other requirements in 1999 rules serve to eliminate need for "anticipation" or guesswork in ascertaining the experts on which opponents will rely); *see also Gillenwater*, 285 S.W.3d at 882 (contrasting the 1999 discovery rules, which "establish a date certain for the completion of discovery, which depends on the discovery plan level and not on the trial

date," with the former rules, which "established a fluid deadline for discovery disclosure, which could be modified based on a change in the date of trial"); *see generally Explanatory Statement Accompanying the 1999 Amendments to the Rules of Civil Procedure Governing Discovery*, Order of Approval of the Revisions to the Texas Rules of Civil Procedure, Misc. Docket No. 98–9196 (Tex. Nov. 9, 1998), printed at 61 Tex. Bar J. 1140, 1140 (Dec. 1998) (noting that discovery-plan requirement (and by extension the component deadlines) "is intended to focus courts and parties on both the need for discovery and its costs in each case," and that rules have overarching goal of "provid[ing] both adequate access to information and effective means of curbing discovery when appropriate to preserve litigation as a viable, affordable, and expeditious dispute resolution mechanism").

scheduling order that permitted such pleading amendments.

Mid Continent equates these circumstances with cases where courts of appeals have reversed Rule 193.6 exclusions of late-disclosed witnesses or evidence in the view that prior independent disclosure of materially the same information negated unfair surprise and unfair prejudice.[41] But any such parallels must take account of two procedural distinctions that McNeill emphasizes. First, while Mid Continent had listed a succession of attorney's-fees experts in its earlier disclosure responses, it did not produce its fee invoices or otherwise "designate" such an expert, in the sense of complying with Rule 194.2(f) and the scheduling order, until the disclosures it made on November 24.[42] By then Mid Continent was two months beyond its expert-designation deadline and the discovery period had already closed. The second is that Mid Continent dropped its prior listing of an attorney's-fees expert when amending its disclosures on November 12. Mid Continent suggests that this change, coupled with its subsequent designation, should be viewed as immaterial in its effect on McNeill's notice of an impending fee claim and expert. The district court would have been within its discretion to conclude otherwise, especially in light of some additional procedural events that preceded the November 12 disclosure amendment.

Following the expiration of the September 21, 2015, expert-designation deadline,

41. *See State v. Target Corp.*, 194 S.W.3d 46, 48-49 (Tex. App.—Waco 2006, no pet.) (abuse of discretion to exclude, based on late supplementation and Rule 193.6, expert testimony regarding subjects and bases that had already been disclosed through expert reports or depositions); *Elliott v. Elliott*, 21 S.W.3d 913, 921-22 (Tex. App.—Fort Worth 2000, pet. denied) (abuse of discretion to exclude expert opinions of health care providers not identified in response to interrogatory inquiring as to claimant's experts, but who had been identified in response to different interrogatory inquiring as to claimant's health care providers); *see also Best Indus. Uniform Supply Co.*, 41 S.W.3d at 146-49 (abuse of discretion to exclude testimony from business's representative who had not been timely identified in disclosures, but predecessor in same position had been, and testimony—solely to prove up damages—would be substantively identical); *Estate of Toarmina*, No. 05-15-00073-CV, 2016 WL 3267253, at *2 (Tex. App.—Dallas June 13, 2016, pet. denied) (mem. op.) (trial court did not abuse its discretion in allowing untimely designated attorney's-fees expert to testify where, among other considerations, party had timely designated its former attorney as its fees expert).

Mid Continent also relies on cases in which appellate courts have similarly relied, at least in part, on preexisting pleadings that asserted claims that would require expert testimony, reasoning that these belied unfair surprise and unfair prejudice from subsequent late designations of experts to support those claims. *See Rhey v. Redic*, 408 S.W.3d 440, 459 (Tex. App.—El Paso 2013, no pet.) (trial court did not abuse its discretion in allowing testimony of late-designated attorney's-fee expert; party had asserted claim for attorney's fees since inception of litigation); *Elliott*, 21 S.W.3d at 921-22 (citing, in addition to disclosures made through responses to other interrogatories, pending claim that would place health-care providers' opinions at issue); *Toarmina*, 2016 WL 3267253, at *2 (also citing attorney's-fee claim that had been asserted since case's inception); *but see Ersek*, 69 S.W.3d at 272 ("[T]he fact that an expert witness is necessary to establish [the proponent's] cause of action does not establish that the [opponent] would not be unfairly surprised" by expert's late designation, and adding that "[t]he [discovery] rules were amended [in 1999] to make that sort of anticipation unnecessary." (quoting *Snider v. Stanley*, 44 S.W.3d 713, 717 (Tex. App.—Beaumont 2001, no pet.))). Whatever the merits of this reasoning, these cases would do more to distinguish Mid Continent's circumstances than support its arguments, as Mid Continent never pleaded an attorney's-fees claim until the day prior to its untimely designation.

42. McNeill also suggests that even Mid Continent's November 24 disclosures were deficient, but we need not address that contention.

McNeill had moved to exclude all of Mid Continent's experts, but with specific emphasis on damages experts, urging in part that Mid Continent had failed to comply with the scheduling order because it had not produced expert reports for each witness.[43] On November 2, Mid Continent filed a response in which it insisted that the scheduling order had not independently required it to prepare expert reports, but had left the necessity of reports governed by the underlying rules that would permit it to make the witnesses available for deposition instead.[44] In that regard, Mid Continent explained that it had opted to avoid incurring the "potentially significant extra expenses" of preparing expert reports because it *does not have a claim for attorney's fees in this case, and thus has tried to reduce its expenses in this matter to the extent possible.*"[45] Ten days thereafter, on November 12, Mid Continent made the amendments to its disclosure responses that deleted any mention of a fees expert. The events preceding the change would tend to belie any perception or inference that the deletion was merely inadvertent or without intended significance.

 Under these circumstances, we cannot conclude that the district court abused its discretion in failing to find, by virtue of Mid Continent's earlier disclosures, that Mid Continent had met its burden to negate unfair surprise and unfair prejudice to McNeill from Mid Continent's

untimely November 24 designations. On the contrary, the district court would have been well within its discretion to conclude that the parties were in materially the same position, in terms of unfair surprise and unfair prejudice to McNeill from the late designations, as if Mid Continent had never previously identified an attorney's-fees experts at all.[46] And while Mid Continent further suggests that McNeill should have deposed one of the fee experts Mid Continent had previously listed, the existence of any such opportunity is not dispositive. As this Court has previously held "simply granting the [party] the right to depose the witness does not ensure that it is not unfairly surprised or prejudiced."[47]

Mid Continent next emphasizes that trial ultimately did not go forward on December 16, 2015, the date originally prescribed in the scheduling order, but was reset to the following February 22. Observing that the new trial date was just over three months after its November 24 designation, Mid Continent insists that the resetting "obviates any surprise or prejudice" from the untimely disclosures "because it afforded McNeill's attorney sufficient additional time to prepare to counter Mid Continent's experts' proposed trial testimony." This was especially true, Mid Continent suggests, in light of McNeill's attorney's own involvement in the case, resultant general familiarity with the nature of the work that Mid Continent's attorneys were performing, and what Mid Continent re-

43. This was the same pretrial motion in which McNeill had challenged—largely successfully—the competence and reliability of the damages experts' opinions. *See supra* at 665-66.

44. *See* Tex. R. Civ. P. 195.3-.5.

45. (Emphasis added).

46. *See, e.g., Ersek,* 69 S.W.3d at 272 (upholding exclusion of late-designated expert under

Rule 193.6; observing, in regard to unfair surprise and unfair prejudice, that "[a] party is entitled to prepare for trial assured that a witness will not be called because opposing counsel has not identified him or her in response to a proper [discovery request]" (quoting *Alvarado,* 830 S.W.2d at 915), and that 1999 revisions were intended in part to eliminate need for "anticipation" or guesswork regarding opponent's experts).

47. *Id.*

gards as a "relatively straightforward" degree of case complexity.

The gravamen of Mid Continent's argument is that there can be no unfair surprise and unfair prejudice, so as to deprive trial courts of discretion to enforce Rule 193.6, if it is physically possible for the aggrieved party to respond to and prepare for late-disclosed witnesses or evidence in time for the eventual trial. Mid Continent overlooks that the current Texas civil discovery rules, unlike the former version, emphasize completion of expert designations and discovery within deadlines that operate independently from the trial date.[48] We cannot conclude that the district court would have abused its discretion in failing to find the absence of *unfair* surprise and *unfair* prejudice to McNeill, notwithstanding the trial postponement, where Mid Continent had designated its fee experts two months beyond the applicable discovery deadline and after the discovery period had closed.[49]

In a final argument advanced by Mid Continent, it posits that McNeill could have suffered no unfair surprise and unfair prejudice because the discovery rules provided means for McNeill to seek to reopen discovery in response to Mid Continent's untimely designation—specifically, Rule 190.5, which allows for reopening of discovery where an adverse party would be "unfairly prejudiced" by a pleading filed after or near the end of the discovery period,[50] and subsection (c) of Rule 193.6, which affords trial courts, in lieu of automatic exclusion when not finding unfair surprise and unfair prejudice, the option of permitting late disclosure and postponing trial to allow responsive discovery.[51] Mid Continent further insists that McNeill had an affirmative duty to seek additional discovery under these provisions, and extracts from case law the proposition that "[t]here is no unfair prejudice or surprise when a party chooses to ignore opportunities to mitigate any purported unfair prejudice." The authorities Mid Continent cites for that proposition, however, have involved circumstances where a party has declined a trial court's offer of additional discovery under subsection (c)[52] or failed to timely move to exclude under Rule 193.6.[53] Neither is the situation here. As applied to this case, Mid Continent's argument would effectively invert its burden of proof under the unfair-surprise and unfair-prejudice exception to Rule 193.6, if not effectively read Rule 193.6's automatic exclusion out of the civil discovery rules entirely. We must instead evaluate the district court's

**48.** *See Gillenwater*, 285 S.W.3d at 882.

**49.** *See id.* (holding, without further elaboration, that party "failed to satisfy his burden of establishing good cause or a lack of unfair surprise or prejudice" against opponent where party "did not designate its experts until three days before the end of the discovery period and more than five months after the expert designation deadline"); *May v. Ticor Title Ins.*, 422 S.W.3d 93, 105 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (holding that trial court acted within its discretion in denying motion under Rule 193.6(b) for leave to designate attorney's-fees expert untimely; motion filed six months after expert-designation deadline but six weeks before trial).

**50.** *See* Tex. R. Civ. P. 190.5(a) (trial court "must allow additional discovery related to new, amended or supplemental pleadings ... if: (1) the pleadings ... were made after the deadline for completion of discovery").

**51.** *Id.* R. 193.6(c).

**52.** *See Hilburn v. Providian Holdings, Inc.*, No. 01-06-00961-CV, 2008 WL 4836840, at *10 (Tex. App.—Houston [1st Dist.] Nov. 6, 2008, no pet.) (mem. op.).

**53.** *See Tri-Flo Int'l, Inc. v. Jackson*, No. 13-01-00472-CV, 2002 WL 31412532, at *2 (Tex. App.—Corpus Christi Oct. 24, 2002, no pet.) (mem. op.).

exercise of discretion under the rules as written.

We cannot conclude that the district court abused its discretion in excluding Mid Continent's evidence of attorney's fees at trial. And absent such evidence, it follows that the district court did not abuse its discretion in refusing Mid Continent's proposed submission of that claim to the jury.[54] The parties also dispute whether Mid Continent satisfied the "presentment" requirement for its recovery of fees under Chapter 38, but our holdings render it unnecessary to reach that question.[55] We overrule Mid Continent's issue.

## CONCLUSION

Having sustained McNeill's legal-sufficiency challenge to the judgment award of lost profits, we reverse that portion of the judgment and render judgment that Mid Continent take nothing on its lost-profits claim. Having overruled Mid Continent's issue, we affirm the judgment that Mid Continent take nothing on its claim for attorney's fees.

---

**54.** *See* Tex. R. Civ. P. 278.

**55.** *See* Tex. R. App. P. 47.1. Similarly, we need not address McNeill's arguments disputing the sufficiency of Mid Continent's offer of proof.