# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00420-CV

---

**Rosa Santis, Appellant**

**v.**

**Together We Rise Corporation, Appellee**

---

### FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-20-001805, THE HONORABLE KARIN CRUMP, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

In the underlying proceeding, appellee Together We Rise Corporation (TWR), a nonprofit corporation, sued appellant Rosa Santis, alleging several claims arising out of a commercial lease of a warehouse property owned by Santis. At the end of trial, the jury found against TWR on all of its claims except for its breach of contract claim and awarded TWR actual damages for amounts paid to Santis, out-of-pocket costs, certain other expenses, and lost donations. The trial court signed a final judgment consistent with the jury verdict, and Santis now brings this appeal, challenging only the legal sufficiency of the evidence supporting the award of damages for lost donations. For the following reasons, we affirm the trial court's final judgment.

## BACKGROUND

The underlying commercial landlord-tenant dispute arose from TWR's attempts to establish a physical presence in Austin, Texas. Founded in 2008, TWR is a national nonprofit corporation that provides assistance and items to children in the foster-care system and scholarships for children exiting foster care. TWR raises funds to support its charitable goals by soliciting direct donations and hosting in-person events with local businesses and their employees. TWR often holds those fundraising events at their own offices, such as their location in Brea, California.

In late 2017, TWR began exploring the opening of another physical office in Austin, Texas. TWR ultimately leased a warehouse property from Santis in May 2018. The property was beset by numerous issues affecting its usability as a location to host events and store donations—including roof leaks; asbestos remediation; and lack of electricity, gas, and air-conditioning—and TWR eventually vacated the property in February 2020.

In March 2020, TWR informed Santis it was terminating its lease under one of the provisions of the parties' lease agreement, and TWR thereafter filed the present lawsuit. As of TWR's fourth amended petition (its live pleading at trial), TWR asserted numerous causes of action, including breach of contract, and sought damages for, among other things, amounts paid to Santis, out-of-pocket costs and expenses, moving costs, and lost donations suffered by TWR because it was unable to use the property for fundraising and donation events.

The lawsuit proceeded to a multiday remote jury trial held in March 2021. Relevant to this appeal, Danny Mendoza, the founder and CEO of TWR, testified that the nonprofit was founded in 2008; assists approximately two- to three-thousand children in the foster-care system each year; and has an office in Brea, California, and had attempted to

establish an office in Austin, Texas. He explained that the nonprofit raises funds through cash donations and by hosting events for foundations, corporations, and volunteers where donors may sponsor items and volunteers help assemble or prepare items for giving to local foster youth. Such events take place "all over, primarily Southern California and Central Texas," with events in California split between events held at TWR's office and on-site events at donors' offices.

Mendoza also testified that TWR sought to establish an Austin location only after spending six months "reaching out to partners, foster agencies, and seeing what the need was and we determined that there was a huge need" in Austin; he explained that he also reached out to "[c]orporate partners and prominent families." The purpose of having a physical location in Austin was to not only provide office space for a permanent staff, but also receive, store, and distribute donations and host volunteer events. He explained that hosting events at TWR's own facilities was important because potential donors often do not have the capacity to host events at their own offices. He also testified that donors "want to give locally and while it does go locally, it's a different experience when the charity is local . . . so [our partners] had asked that we have a local presence [in Austin] to continue to do more events with us."[1] Mendoza testified TWR was unable to hold events "suitable for our actual goal [of] creating an experience for people to give back" because of the issues with the warehouse property. He described examples of cancelled events, such as a planned Halloween event for foster youth that would have provided "a safe place to trick or treat and create a haunted house."

---

[1] Erika Arambula, a TWR employee who works in fundraising with corporate partners, reiterated this testimony that a local presence would ensure "[m]ore donations but also donations that would target the community better" and that, with TWR lacking a local facility, any corporate donor would instead need to host an event for their employees at their own offices.

Mendoza testified that TWR estimated its lost donations arising from lacking the local physical location at $390,303. Describing how TWR arrived at that amount, he stated that the California office generated approximately $1,117,800 in donations in 2019. He adjusted that figure down to approximately 41 percent (to approximately $458,000), based on the relative population of Austin compared to the California location. Mendoza testified that he then adjusted the figure down by another 20 percent (to approximately $366,000) because the Austin location would be a new physical location "and we wouldn't expect to do the exact same" as the California location. When asked why he did not make a larger reduction for the newness of the location, Mendoza testified that the organization itself was not new to Austin, held "a lot of events here," and had many corporate partners in Austin that also had offices in California where TWR already had "a big presence." He also explained that TWR was not "starting from scratch," had employees coming to Austin to help start the new location, and was already an established multimillion-dollar national organization. Mendoza then took the estimated annual returns, divided by twelve for a monthly figure, and then multiplied by eighteen for the total number of months (October 2018 through March 2020) that TWR was seeking lost donations (to approximately $549,000). That figure was then adjusted down by eight percent because TWR's historical funding distribution is "about 92 percent of each dollar goes directly to the program. And then 8 percent is the over-heading and staffing," and then he subtracted the $115,688 in donations they actually received to reach the final estimated amount of $390,303. Mendoza explained that he was reasonably certain of that number based on his thirteen years of experience with TWR, TWR's fundraising history, and his conversations with potential donors and other partners in Austin.

Mendoza confirmed that he founded TWR, had been working with the nonprofit since 2008, and in his role was aware of both the donations received from various sources and the books and financial resources of the nonprofit. Discussing the $1.1 million figure for the California location, Mendoza explained that TWR keeps detailed records regarding every donation received by the nonprofit, including providing "every donor an actual physical receipt," and that he received the financial numbers from his accountant. He also testified that he manages the Brea location. Mendoza explained that the donations include "online donations for that location, checks, money orders as well as actual goods, in-kind donations." When asked how TWR is able to know if any particular donation is from that specific location rather than nationally, Mendoza explained donors specify the location they are directing their donation towards. He also emphasized that while TWR is a national organization, it was important to have a local presence because its donation partners "are big, big donors in the foster care space . . . and wanted us to come to Austin so that their local employees can give back on the local level."

Victoria Moran, TWR's office coordinator, later testified that she "handle[s] a lot of the operations and all of the financials for the organization." She stated that she helped in calculating the damages sought in the lawsuit, and that she had reviewed the books and expenses "to calculate just the amount that we had put forth into trying to make Austin work." She reiterated Mendoza's testimony that the main focus of opening the Austin location was hosting local volunteer events to "really get the community involved in Texas," to "work with our larger donors or our larger partnerships," and to "get just as many donations as possible to local foster youth." She explained that TWR creates certain donation programs, that partners and corporations decide "we want to donate this amount or this is what we want to put forth towards

5

the community," and then TWR gives opportunities and options to donate to those resources. She said that the program and service activities usually involve cash donations, but that TWR also receives in-kind donations such as clothing and toys. She explained that TWR has to keep accurate records of donations received because persons donating to charitable organizations have tax implications for the donations.

In calculating lost donations, Moran testified that she assisted in figuring out what donations they expected to receive at the Austin location. She provided financial information regarding donations at the California location and explained that the total was based on events held at the California office. For 2019, she "calculated everything we did for the year as far as donation goes [for events] held at that location" and excluded donations from non-location events. She confirmed the $1.1 million amount of donations for the California location, and she stated those donations constituted approximately one-sixth of the $6.15 million in donations received by TWR nationwide that year. She also explained that the fair value of the in-kind donations is determined based on information provided by the donating corporation, who oftentimes provide donations of their own products, such as makeup, clothing, or socks. She explained that the California location also received cash donations relating to service activities or programs held at the location from "corporations or partners that wanted to have actual events at our facility." She stated that she was confident that the $1.1 million is accurate.

On cross-examination, Moran admitted that the California location had existed for eleven years as of 2019 and that she did not believe the new location in Austin would have "the same level of giving" in its first year as the California location. But she explained that "we took into consideration just the location we were moving to and the idea that it was a new location,"

6

and she testified that the nonprofit's eleven years of experience meant "we have an idea of how to do [things] and what we need to do to provide services where we were at."

After further testimony and closing arguments, the jury rendered a verdict finding Santis liable only for the breach of contract claim and awarding TWR $35,000 in amounts paid to Santis; $47,130 for out-of-pocket costs; $1,250 for expenses arising from vacating the property; and $125,000 for lost donations "that were a natural, probable, and foreseeable consequence of Rosa Santis's failure to comply." On May 27, 2021, the trial court rendered judgment for TWR and signed a final judgment consistent with the jury verdict. Santis filed a motion to disregard or for partial new trial challenging the lost-donations damages, which was denied by operation of law. This timely appeal followed.

**STANDARD OF REVIEW**

Evidence is legally insufficient only when "(1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence for a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the absence of a vital fact." *Mid Continent Lift & Equip., LLC v. J. McNeill Pilot Car Serv.*, 537 S.W.3d 660, 664 (Tex. App.—Austin 2017, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005)). Especially for jury findings, we must indulge "every reasonable inference" in favor of the jury's finding, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* "If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails." *Holt Atherton Indus., Inc. v. Heine*,

835 S.W.2d 80, 84 (Tex. 1992); *accord Marshall v. Estate of Freeman*, No. 03-20-00449-CV, 2022 WL 1273305, at *4 (Tex. App.—Austin Apr. 29, 2022, no pet.) (mem. op.).

The parties agree that TWR's damages for "lost donations" are governed by the same requirements as damages for lost profits. Such losses need not be "susceptible to exact calculations." *Mid Continent*, 537 S.W.3d at 664 (quoting *Holt Atherton*, 835 S.W.2d at 84). However, recovery for lost profits does require a showing of the amount of lost profits "by competent evidence with reasonable certainty." *Holt Atherton*, 835 S.W.2d at 84. "What constitutes reasonably certain evidence of lost profits is a fact intensive determination, but the common thread running through [the] cases applying this standard is the necessity that the claim of lost profits not be hypothetical or hopeful but substantial in the circumstances." *Mid Continent*, 537 S.W.3d at 665 (internal quotation marks omitted) (quoting *Phillips v. Carlton Energy Grp.*, 475 S.W.3d 265, 279 (Tex. 2015)). For example, lost-profits damages are not available when the evidence is "largely speculative," *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 860 (Tex. 2017); "dependent upon uncertain and changing conditions, such as market fluctuations," *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994); or "from untested ventures or in unpredictable circumstances," *Phillips*, 475 S.W.3d at 280.

Lost-profits calculations must also be demonstrated with "competent evidence." *Mid Continent*, 537 S.W.3d at 665. That is, "[at] a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *See Holt Atherton*, 835 S.W.2d at 84. The amount "must be predicated on one complete calculation," *id.* at 85, and must reflect the lost "*profits*—the net of income or revenues from a business activity less the expenses incurred in that activity," *Mid Continent*,

8

537 S.W.3d at 665. But "[t]here is no one proper method for determining lost profits as damages," *DaimlerChrysler Motors Co. v. Manuel*, 362 S.W.3d 160, 190 (Tex. App.—Fort Worth 2012, no pet.), and a party is not mandated to follow "any specific accounting or mathematical methodology for determining lost profits with a reasonable certainty," *Mid Continent*, 537 S.W.3d at 665.

## DISCUSSION

In her only issue on appeal, Santis contends that the evidence is legally insufficient because the $125,000 in lost-donation damages is not demonstrated by "competent evidence with reasonable certainty." *Holt Atherton*, 835 S.W.2d at 84. TWR responds that the evidence supporting the lost-donation damages is consistent with past approaches for calculating damages and more than a scintilla of evidence supports the jury's finding. We agree with TWR.

In so many words, Santis argues that there is a lack of "competent evidence" because TWR relied on only non-expert, testimonial evidence and failed to present corroborating evidence supporting the 2019 donation figures for the California location. Mendoza, however, is the founder and CEO of TWR and testified that he was aware of the books and financial records of the nonprofit company and the donations received by TWR from various sources. The testimony of the long-serving leader of TWR—aware of said donation information and referencing donation data received from his accountant—is exactly the type of competent evidence that may support a lost-profits analysis. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010) (concluding that long-time owner of small company was competent to testify on estimated profit margin based on information from accountant); *cf. Bowen v. Robinson*, 227 S.W.3d 86, 97 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)

9

("Competent evidence of lost profits relating to property can be proved by the testimony of an expert or the owner of the property."). Nor did Mendoza's testimony stand alone. Moran, who assisted with TWR's bookkeeping, also provided corroborating testimony about damages, including calculating donation figures for the California location, corroborating the accuracy of the California location figures, and describing the factors considered in estimating the Austin location's estimated donations. Santis complains that there was no corroborating documentation supporting the $1.1 million donation figure for the California location besides testimony at trial, but TWR is not required to present such documentation to support its request for lost donations. *See Holt Atherton*, 835 S.W.2d at 84 ("Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates."). Accordingly, the testimony presented by TWR satisfies the "competent evidence" requirement for lost-profits calculations. *See Mid Continent*, 537 S.W.3d at 665.

Santis also argues that the lost-donations amount cannot be determined with "reasonable certainty" because the calculation advanced by TWR is too speculative for the "new and untested venture" in Austin. Although Santis is correct that the Austin office was a new location for TWR, that does not mean TWR has undertaken a new and untested activity. Rather, there was uncontested evidence that TWR had over a decade of experience in holding events and soliciting donations directed towards assisting children in the foster-care system, and the establishment of the Austin location was a continuation of that activity. *See Texas Instruments*, 877 S.W.2d at 280 (explaining that whether lost profits arose from something "new or unestablished" focuses on "the experience of the persons involved in the enterprise and the nature of the business activity, and the relevant market"). When the activity in question is well-established—here, having a physical location as part of a nonprofit's solicitation of donations—

10

the fact that the Austin location was new does not preclude recovery. *See America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 629 (Tex. App.—San Antonio 1996, writ denied) ("It is the activity that is the enterprise, and if the activity is well-established, the fact that a newly formed entity is engaging in the activity will not preclude recovery.").

Here, TWR introduced evidence regarding the total annual amount of donations (approximately $1.1 million) received at another, already established location of the same charity. *Cf. DaimlerChrysler*, 362 S.W.3d at 190 ("Texas courts have accepted the yardstick analysis specifically for determining lost profits from a new business by using a comparable established business that is also owned and operated by the plaintiff, as in this case."). This $1.1 million figure, and the veracity of the records kept by TWR to track the amount of donations received, was supported by additional testimony from Moran, and Santis does not point us to any evidence contradicting this starting figure. *See ERI Consulting*, 318 S.W.3d at 876–77. Mendoza then walked through the specific adjustments made to the figure to calculate the amount of donations TWR expected to receive at the Austin location, including controlling for population differences, the relative age of the new location compared to the California location, and TWR's charitable funding allocation. *See Holt Atherton*, 835 S.W.2d at 85 ("Recovery of lost profits must be predicated on one complete calculation."). Finally, TWR also reduced its lost-donations amount by the amount of donations TWR actually received arising from the Austin location. *Cf. Mid Continent*, 537 S.W.3d at 665 (explaining lost-profits amount must not include expenses).

Santis likens this calculation to the lost-profits calculation at issue in *Mid Continent*, where this court found the evidence legally insufficient because it relied on a "chain of inferences" that "requires speculation at multiple levels." *Id*. at 669. That comparison,

11

however, is unavailing. *Mid Continent* involved damages relating to lost rental income for a specialized high-lift capacity forklift where the forklift owner failed to present any evidence "of the frequency or duration of prospective rentals," failed to elicit any testimony of a definitive calculation as to the amount of net profits from rentals during the relevant time period, and relied on the unsupported assumptions that the "piece of junk" equipment with a long history of mechanical breakdowns and repairs would suddenly work without issue after some anticipated repairs. *Id.* at 666–69. Furthermore, there was extensive testimonial evidence by an expert (presented by the forklift owner) that directly undermined or contradicted the owner's lost-profits claim, including that the expert admitted his willingness to "undercut" the prospective rentals by "'as soon as I can find one, . . . buy a machine and replace [the forklift], and have my machine rented' instead." *Id.* at 668.

Santis also complains that the lost-donations calculation does not rely on specific types of evidence, such as identifying specific donations not made, charitable-contribution rates, or charitable donations received from central Texas in previous years. *See, e.g.*, *ERI Consulting*, 318 S.W.3d at 877 ("Contrasting revenue from a time period immediately before the period at issue is an established method of proving revenue for a lost profit damages calculation."); *Holt Atherton*, 835 S.W.2d at 85 (concluding evidence lacked reasonably certainty because "bare assertion that contracts were lost" was not accompanied by evidence regarding "which contracts [were] lost, how many [were] lost, how much profit they would have had from the contracts, or who would have awarded them contracts"). But there is not a single "right" method for determining lost profits as damages, nor was TWR required to follow a specific "accounting or mathematical methodology for determining lost profits with a reasonable certainty." *Mid Continent*, 537 S.W.3d at 665; *see also DaimlerChrysler*, 362 S.W.3d at 190.

12

Considering all the evidence in the record and indulging every reasonable inference in favor of the jury's finding, *Mid Continent*, 537 S.W.3d at 664, TWR presented "competent evidence with reasonable certainty" about its lost donations arising from its unsuccessful attempt to establish a physical Austin location, *see Holt Atherton*, 835 S.W.2d at 84. There is therefore more than a scintilla of evidence supporting the award, *id.*, and the evidence was legally sufficient. We overrule Santis's only issue on appeal.

## CONCLUSION

For the above reasons, we affirm the trial court's final judgment.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed:   July 19, 2023