# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-07-00541-CV

Shalanda Augillard, Appellant

v.

Tiffany Madura and Richard Toro, Appellees

FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT
NO. 06-0762, HONORABLE WILLIAM HENRY, JUDGE PRESIDING

## O P I N I O N

This appeal arises from a suit for conversion filed by Shalanda Augillard alleging that Tiffany Madura and Richard Toro[1] wrongfully exercised dominion and control over Augillard's black cocker spaniel, Jazz, who was recovered from New Orleans in the wake of the Hurricane Katrina disaster in August of 2005.[2] Madura responded that while she did adopt a dog that had been

---

[1] As did the parties in their briefs, we will refer to the appellees collectively as "Madura."

[2] The circumstances following the hurricane have been well documented, particularly concerning the effects on New Orleans's pet population:

> Hurricane Katrina made landfall at 6:10 a.m. on August 29, 2005. Within hours Louisiana's levee system was overtopped and breached. By August 31, eighty percent of New Orleans was under water. The media bombarded the public with images and stories of animals stranded alone amidst the devastation. These accounts poignantly conveyed the message that our national policies and laws were severely flawed when it came to animals and disasters.

Megan McNabb, *Pets in the Eye of the Storm: Hurricane Katrina Floods the Courts With Pet Custody Disputes*, 14 Animal L. 71, 72 (2007) (citations omitted).

rescued from New Orleans, her dog, Hope Floats ("Hope"), is not the same dog that Augillard lost in the flood. The case was tried before the court, which found that Augillard failed to prove by a preponderance of the evidence that the dog in question was Jazz and entered judgment in favor of Madura. Augillard asserts on appeal that the trial court erred in disregarding conclusive evidence, including forensic DNA analysis, establishing that Hope and Jazz are the same dog and in denying Augillard's request for injunctive relief. In two points of error, Augillard challenges the legal and factual sufficiency of the evidence supporting the trial court's judgment. Because we conclude that the evidence is legally insufficient, we reverse and render judgment in favor of Augillard.

**BACKGROUND**

This case began in May 2006 when Augillard filed suit for conversion, seeking a temporary restraining order and an injunction in an effort to have the dog she believed was Jazz returned to her. After several hearings on Augillard's motions, the court ordered that the dog remain in Madura's possession but enjoined Madura from moving the dog outside of Hays County. The case proceeded to trial in June 2007.

The central issue at trial and the only disputed issue on appeal is whether Augillard's dog, Jazz, and the dog that Madura adopted from New Orleans after Hurricane Katrina, Hope, are in fact the same dog. In an effort to prove Jazz's identity, Augillard offered two DNA tests and expert testimony regarding Jazz's and Hope's similar medical conditions, as well as her mother's and her own testimony that each of them had personally identified Hope as Jazz.

At trial, Augillard testified that she left Jazz in her mother's care when her job with Federal Express required her to stay at the New Orleans Airport and oversee the delivery of

2

evacuation supplies. She testified that her mother was eventually required to evacuate her home by the National Guard and was not permitted to take Jazz onto the rescue boat.[3] Augillard's mother then left Jazz on the second floor of her home with several weeks' worth of water and food. Augillard explained that after the hurricane, she was among the first civilians permitted to reenter the city, and she immediately went to her mother's house to try to recover Jazz. Finding the door kicked in and Jazz missing, Augillard began contacting local shelters, online pet registries, and organizations that had been set up to facilitate post-Katrina pet recovery. Eventually, Augillard was put in touch with Andy Odam of PawMatch.com, a website that Augillard believed had posted a picture of Jazz.[4] Augillard testified that Odam refused her repeated requests to see the dog and to verify that it was her missing pet. Despite not being able to see the dog in person, Augillard testified that she immediately recognized Jazz from the photographs because she had raised the dog for the last eight and a half years, from the time that Jazz was only a few weeks old. Augillard eventually

---

[3]  In response to Hurricane Katrina, Congress passed the Pet Emergency Transportation Safety Act of 2006. The PETS Act requires local and state disaster plans to include provisions for household pets and service animals in the event of a natural disaster or emergency in order for the locality to be eligible for Federal Emergency Management grants. *See* H.R. 3858, 109th Cong. (2006) (enacted).

[4]  Odam testified at trial that his organization brought crates and other pet supplies to New Orleans on September 12, 2005. He stated that while delivering supplies, he came into possession of a black cocker spaniel that he transported to Texas. Odam used "pictures of the dog in a blog" that he was running for his website, PawMatch.com, and solicited charity contributions for her. Odam testified that he never listed the dog with Pet Finders, an online registry and database for locating missing pets.

Thomas Darnell, another volunteer who accompanied Odam to New Orleans, also testified. He explained that he and Odam were instructed by leaders from the SPCA not to remove any animals from the city because local owners were still trying to find their pets, and that Odam took the black cocker spaniel anyway because he wanted "a poster child to represent what we had done."

learned from her contacts in cocker spaniel rescue groups that the dog from the website had been brought to Hays County, Texas.[5]

Augillard also testified concerning Jazz's medical history. She stated that for about six years, Jazz had suffered from thyroid problems, a skin condition that caused thinning of Jazz's hair, and bladder problems that resulted in Jazz's frequent urination and the occasional appearance of blood in her urine. Professional photographs that Augillard had taken of Jazz in 2003 or 2004 were admitted into evidence and showed that Jazz's hair was thinning around her neck and the lower portion of her body, which Augillard testified was a "fairly common" condition for Jazz. The trial record also contains a portion of Jazz's veterinary documents (those that survived the flood), which indicate that Jazz (1) had been administered her shots and vaccinations, (2) received regular physical examinations, (3) was prescribed several different medications, including Cephalexin and Neopredef powder, and (4) had been regularly bathed and groomed.

On cross-examination, Madura's counsel attempted to call into doubt Augillard's assertion that Jazz and Hope are the same dog. Noting Augillard's prior statements that Jazz was in "excellent physical condition" as of August 29, 2005, and that Jazz had suffered from chronic health issues, specifically "thyroid illness" and "urinary tract problems (kidney stones)," Madura's counsel cited evidence that when Hope arrived in Austin, she was suffering from a serious and

---

[5] In the chaotic aftermath of the flood, at least 50,000 pets were stranded in the New Orleans area. McNabb, *supra* note 2, at 75. Approximately 15,000 were rescued by Animal Control and other volunteers; of these, about 3,000 were promptly reunited with their owners, while 12,000 were adopted. *Id.* Many of these 12,000 pets were transported to jurisdictions as far away as New Jersey, Arizona, and Pennsylvania. *Id.* at 76; *see also id.* at 84-103 (surveying the post-Katrina pet-custody litigation).

4

apparently untreated case of hypothyroidism and had two abnormally large bladder stones, rather than kidney stones.[6] Counsel further emphasized that Hope's skin condition resulted in her having a very strong and distinctive odor, although Augillard had testified that Jazz had no unusual smell, other than a "slightly stronger urine smell."

Further testimony regarding the dog's medical conditions was offered from Dr. Tom House and Dr. Garrett Donop, the two veterinarians who treated Hope after she arrived in Texas. House was the first to treat and diagnose the dog after she was relocated to the Hays County area. He testified at trial that Hope, an older cocker spaniel, "was obese, had thin hair coat, [and] had been clipped fairly recently." He explained that the dog exhibited several conditions that are

> fairly common in an older cocker spaniel. The thin coat goes along with [hypo]thyroidism. Bad ears—cockers are known for bad ears. Those are typical for any cocker spaniel you see. This one did have diarrhea, which wouldn't be surprising not having—not knowing what it had eaten in the last several days. [The dog had] some internal parasites as well as fleas. The dog did have some evidence of staph infection in the skin. And certainly the staph infection in the skin and the yeast infection in the ears would go along with being in the water, especially in a [hypo]thyroid dog.

House testified further that the dog "was probably well taken care of," evidenced by the fact that she had been groomed recently and had been given heartworm-prevention medication.

---

[6] This evidence was offered through the testimony of Garrett Donop, one of the veterinarians who treated Hope after she was brought to Texas. Although Donop had previously testified at the temporary injunction hearing, Augillard objected to Donop's testifying as an expert witness at trial on the basis that Madura had failed to designate Donop as an expert. The trial court sustained Augillard's objection and permitted Donop to offer only factual testimony concerning his observations of the dog. Madura does not a raise a cross-point on appeal complaining that Donop's expert testimony was improperly excluded during trial.

When asked whether he had detected the golf-ball-sized bladder stones, House testified that he examined the dog's bladder but did not feel any stones.

Madura's veterinarian, Dr. Donop, testified that Madura brought Hope in for an examination in September of 2005 after the dog showed signs of having a bladder problem. He stated that Hope presented as "a happy dog" who was overweight and had "seborrhea or greasy skin, kind of thin-haired greasy skin," which he suspected was the result of hypothyroidism. He testified that when he first examined Hope, he performed an ultrasound examination, which is done for all "urine-tract-prone animals," and that he found no bladder stones at that point. After problems continued for several weeks, Donop took x-rays, revealing two "larger than golf-ball-sized stones" that he had not previously detected. Donop was permitted to testify, over Augillard's objection, that the size of the bladder stones indicated that the condition should have been diagnosed earlier because "you aren't going to grow these sized rocks in a week's time." He further stated that he believed Hope's glandular condition was due to her hypothyroidism, which also causes a dog to have a "strong" odor.

Donop was asked on cross-examination whether the dog's skin condition could have been exacerbated by stress, and he testified that stress could increase both the severity of the skin condition and the growth of bladder stones.

In addition to the testimony comparing Jazz's and Hope's medical conditions, Augillard also called Dr. Joy Halverson, an expert in the field of DNA analysis and the director of QuestGen Forensic Laboratory.[7] Halverson testified concerning two DNA tests that she performed

_____

[7] Halverson is also a licensed veterinarian and holds advanced degrees in veterinary medicine and veterinary epidemiology. At trial, Madura did not object to Halverson's being qualified as an expert.

6

in this case. In the first analysis, which was admitted into evidence, Halverson compared DNA material from Hope with DNA extracted from one of Jazz's dog brushes.[8] According to Halverson, the test showed a complete match at all seventeen DNA markers with a likelihood ratio exceeding one trillion, meaning that "it is a trillion times more likely that the samples match because they came from the same dog" than because the samples "came from different dogs and match by chance."[9]

Halverson testified that the second test, which was conducted a month later, compared Hope's mitochondrial DNA to the mitochondrial DNA taken from Madison, a cocker spaniel born to the same mother as Jazz.[10] The results showed that Hope and Madison have the same mitochondrial type, which occurs when two dogs are maternal relatives, and that Hope and Madison could therefore have the same mother. Halverson testified that her lab's database contains a fairly diverse number of mitochondrial types for cocker spaniels and that, given the vast extent to which

---

[8] The suggestion to conduct DNA analysis was first raised during the May 30, 2006 temporary injunction hearing. At that time, the parties agreed that a buccal sample would be collected from Hope and sent to the DNA lab and that Augillard would try to salvage some of Jazz's hair from the hurricane debris for scientific comparison.

Halverson's first DNA report, which was admitted into evidence, indicates that on June 1, 2006, the lab received a shipment of two dog sweaters and a hairbrush, along with "a prescription for Jazz Augillard from Lakeview Veterinary Hospital in New Orleans for Neopredef powder dated 3/2/99." Halverson testified that she was able to extract a usable DNA sample from exudate in the hairbrush and that the exudate material is a "brown-red," "serum-like" substance that commonly results from "canine skin disorders."

[9] Also noteworthy are Halverson's observations in her report that the Neopredef prescription bottle accompanying the hair sample from the dog brush made it evident "that the owner had been treating the dog for many years" for its skin condition and that "such conditions are common in Cocker spaniels and are particularly problematic in hot, humid environments such as New Orleans."

[10] Both Jazz's and Madison's American Kennel Club pedigree papers were admitted into evidence, establishing that they shared the same dam, Hunter's Little Lady III. Madison's owner, a project engineer for Lockheed Martin, traveled from Virginia to testify at trial concerning Madison's matrilineage; she also testified regarding the chain of custody of Madison's DNA sample and its submission to the DNA lab for analysis.

cocker spaniels have been bred in the United States, mitochondrial types among the cocker spaniel breed are more diverse than among other breeds. She further stated that the mitochondrial type shared by Hope and Madison is not shared by any of the other cocker spaniels in the database.

Halverson admitted on cross-examination that it was "potentially true" that there could be a chain of cocker spaniels who would all be related through the mother's DNA and that such a chain could consist of hundreds of dogs spanning several generations. She clarified that in practice, however, there is generally not such a "concentration of certain mitochrondrial types," and she rejected counsel's suggestion that perhaps even "thousands" of cocker spaniels would share the same mitochondrial type, i.e., that they would all derive from a single maternal relative.

Madura also testified at trial. She stated that she picked up Hope from Andy Odam on September 26, 2005, and that the dog "smelled really, really bad," "her hair was very thin everywhere and gone in many spots," and "she was urinating blood." Madura testified that Hope was diagnosed with hypothyroidism, had been prescribed Cephalexin, and had two large bladder stones removed. Madura also submitted photographs of the dog that were taken within a month after Hope was rescued. She testified that the photographs show Hope's "skin condition on her neck and [a] little bit on her back," explaining that while the photographs did not fully depict it, "the hair loss was all over the body with the exception of her head and her legs."

At the conclusion of the trial, the court entered a take-nothing judgment as to Augillard's claim,[11] making the following findings of fact and conclusions of law:

---

[11] The judgment also disposed of Madura's counterclaims against Augillard, which are not relevant to this appeal.

8

The main disputed issue involved whether or not Augillard owned the property, i.e. the dog. Augillard failed to prove the case by a preponderance of evidence.

The testimony of Augillard's witnesses was not credible.

A reasonable fact finder could not find that the D.N.A. evidence presented by Augillard has been authenticated or identified thus indicating a high potential for tampering.

Augillard now appeals.


## DISCUSSION

Augillard asserts that the evidence is legally and factually insufficient to support the trial court's judgment because she conclusively established every element of her claim for conversion. We agree.

When a party attacks the legal sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). In order to establish conversion of personal property, a plaintiff must prove that (1) she owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Apple Imports, Inc. v. Koole*, 945 S.W.2d 895, 899 (Tex. App.—Austin 1997, writ denied). It is undisputed that Madura exercised dominion and control over the dog, Augillard demanded return of the dog, and

9

Madura refused to return the dog to Augillard. Therefore, as the trial court correctly determined, resolution of this matter turns on whether Augillard established that she owned the dog, thereby making Madura's possession unlawful.

The trial court found that Augillard failed to prove that Jazz and Hope are the same dog and thus failed to prove ownership. In reviewing the legal sufficiency of the evidence, we must credit evidence that supports the verdict if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Under our legal-sufficiency review, we cannot disregard contrary evidence that conclusively establishes the opposite of a vital fact. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam) (court must first examine record for evidence supporting verdict, ignoring all evidence to contrary; if there is no such evidence, court then examines entire record to see if contrary finding is established as matter of law). "Proper legal-sufficiency review prevents reviewing courts from substituting their opinions on credibility for those of the jurors, but proper review also prevents jurors from substituting their opinions for undisputed truth. When evidence contrary to a verdict is conclusive, it cannot be disregarded." *City of Keller*, 168 S.W.3d at 816-17. This is equally true when the factfinder is the trial court, rather than a jury. *See id.* at 816 n.66 (citing *Murdock v. Murdock*, 811 S.W.2d 557, 560 (Tex. 1991)). While the factfinder is the sole judge of credibility, decisions regarding credibility must be reasonable, and the factfinder is not permitted to ignore undisputed testimony that is "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Id.* at 820.

Augillard argues that it was error for the trial court to ignore uncontroverted DNA evidence conclusively establishing that Hope and Jazz are the same dog. The results of the first DNA analysis confirmed that the sample collected from Hope was a "perfect match" to the material Halverson extracted from Jazz's dog brush, establishing to a very high degree of scientific certainty that Hope and Jazz are the same dog. Madura neither offered contrary DNA evidence nor disputed the validity of this perfect DNA match. While it is "impossible to define precisely when undisputed evidence becomes conclusive," as the court explained in *City of Keller*, "undisputed contrary evidence becomes conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied." *Id.* at 815.

Rather than challenge the results of the DNA test, however, Madura asserts that the sample purportedly obtained from Jazz was in fact taken from Hope, pointing to the trial court's finding that the DNA evidence was not "authenticated or identified thus indicating a high potential for tampering." However, Madura cites nothing in the trial record that would support the allegation that the DNA evidence had been tampered with, nor have we found any evidence in the record to support such a claim. In fact, the uncontradicted evidence at trial was that Augillard did not have an opportunity to obtain a DNA sample from Hope. It was undisputed that Augillard and her family members did not have contact with Hope after the May 30, 2006 temporary injunction hearing at which Augillard's counsel first requested DNA testing with the trial court. It was also undisputed that the only contact Augillard and her family had with Hope prior to that hearing was on May 5, 2006, when they were permitted to see the dog as she was being transported to the Dog Camp kennel. There was no evidence that they brushed the dog or, for that matter, that they were ever

11

alone with the dog on that day; Augillard's attorney and a county constable were also present when Augillard and her mother were with the dog.[12]

---

[12] Augillard testified at trial about providing Jazz's dog sweaters and brush for DNA testing:

Q.      After this suit was filed, were you asked to find things that might have Jazz's hair on it?

A.      Yes.

Q.      What types of things did you look for that might have Jazz's hair on it?

A.      Hairbrush, sweaters, anything that I could find that belonged to her.

Q.      And were you asked to do that after the hearings in May?

A.      Yes.

Q.      Okay.  Did you find the hairbrush or sweater?

A.      Yes, I found both.

Q.      And what did you do with those items?

A.      I put them in a bag and placed them in my trunk until the next hearing in San Marcos.

Q.      And then what did you do with them?

A.      After the hearing I gave them to [my attorney].

Q.      Did you examine or tamper with those brushes or sweaters in any way?

A.      No.

Q.      Did you plant any DNA evidence on the brushes or sweaters?

A.      No.

In this respect, we think Madura's challenge to the DNA evidence presents a situation analogous to that in *Murdock*. In *Murdock*, an alleged father challenged the court's finding of paternity and judgment ordering him to pay child support after blood tests excluded him as the biological father of a child born to his ex-wife during their marriage. 811 S.W.2d at 558. The mother did not object to the admission of the blood tests at trial or attempt to dispute their validity.

---

Consistent with those statements, Dr. Halvorsen testified that she received FedEx shipments with chain of custody slips indicating that the dog brush and sweaters were sent to her lab by Augillard's attorney.

In addition, Augillard's mother testified that she did not take any samples from Hope on May 5, 2006:

Q.   Did you see a dog that you believed to be your daughter's dog on May 5, 2006?

A.   Yes.

Q.   Thank you. Did you brush the dog at that time?

A.   No.

Q.   Did you recognize the dog?

A.   Yes.

Q.   Was it your daughter's dog?

A.   Yes.

Q.   Have you ever taken any samples of any kind, blood, hair, or otherwise, from the dog?

A.   No.

Q.   Have you seen anyone do that?

A.   No.

13

Rather, she testified that she never had sexual relations with any other men during the marriage and that her ex-husband had always treated the child as his own. *Id.*

Despite the fact that the blood tests were admitted without objection and showed that Murdock had not fathered the child, the court of appeals held that the evidence was legally insufficient to establish that the tests were "properly conducted" and affirmed the judgment of the trial court. *Id.* at 560. Reversing the court of appeals, the Texas Supreme Court held that "[o]nce the trial court receives blood test results into evidence, they are admitted for all relevant purposes just like any other piece of evidence." *Id.* The supreme court concluded that the evidence offered by the alleged father was conclusive proof that he was not the father of the child and that he was therefore entitled to judgment in his favor. *Id.*

Likewise, the trial court in this case admitted into evidence Dr. Halverson's DNA analysis establishing to a very high degree of scientific certainty that the two samples she tested were from the same dog. Madura's only objection to the first DNA analysis was based on a sanctions motion alleging that she had not been properly allowed to depose Halverson; however, she made no objection to the admission of the DNA test on the basis that it was inauthentic or that the samples had been subject to tampering.[13] Nor did Madura attempt to rebut Augillard's DNA evidence by

---

[13] As we understand it, Madura's challenge is limited to the authenticity of Jazz's DNA sample extracted from Jazz's dog brush. Madura has never argued that the samples used in the second DNA analysis involving Madison were tainted, nor has she questioned the authenticity of the buccal swabs obtained from Hope. With respect to her tampering allegation, Rule 901(a) provides that the authentication or identification of an item for admissibility purposes is satisfied by evidence that is sufficient to support a finding that the item in question is what its proponent claims. Tex. R. Evid. 901(a); *Silva v. State*, 989 S.W.2d 64, 67 (Tex. App.—San Antonio 1998, pet. ref'd). "A showing of the *possibility* of tampering or commingling is not sufficient to bar admission of the evidence, and goes only to the weight of the evidence." *Dossett v. State*, 216 S.W.3d 7, 17 (Tex. App.—San Antonio 2006, pet. ref'd) (citing *Darrow v. State*, 504 S.W.2d 416, 417 (Tex. Crim. App. 1974)) (emphasis in original).

14

calling into question the methods used to conduct the analysis, offering another DNA analysis showing that Hope and Jazz are not the same dog, or having another expert challenge the results of the DNA test proffered by Augillard. She did not offer any testimony or evidence at trial indicating that the sample from Jazz had been tampered with or was inauthentic, nor did she cross-examine Augillard or her witnesses regarding Augillard's version of the dog brush and sweater's chain of custody. The record before us is devoid of any evidence that contradicts the items' chain of custody as testified to by Augillard, her mother, and Dr. Halverson.[14]

Once it admitted into evidence the DNA analysis confirming that the dog in Madura's possession is in fact Augillard's dog, the trial court erred by choosing to disregard that evidence, which was conclusive of the vital fact of the dog's ownership. Madura's subsequent attempts to cast doubt on the authenticity of the samples amounted to no more than "mere surmise or suspicion," *see Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004), that Augillard had somehow extracted a DNA sample from Hope and planted it on items belonging to Jazz; such conjecture will not sustain the verdict in the face of conclusive, uncontroverted evidence establishing the dog's

---

[14] In her briefing to this Court, Madura cites Halverson's testimony from the hearing on the reconsideration of the temporary injunction that occurred on December 12, 2006, to support the trial court's finding that there was a "high potential for tampering." Halverson's testimony at that hearing, in which she stated that her results were "only as good as the samples" given to her and that, as far as she knew, both samples could have come from Hope, does not contradict the evidence that Augillard had no opportunity to obtain a DNA sample from Hope. Even more significantly, Halverson's previous testimony was not admitted by the trial court and was not part of the record in this case. Although the trial court took judicial notice of its file, "the trial court cannot take judicial notice of testimony from a previous proceeding at a subsequent proceeding unless the testimony is admitted into evidence at the subsequent proceeding." *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 161 S.W.3d 531, 539-40 (Tex. App.—San Antonio 2004, pet. denied). *See also Escamilla v. Estate of Escamilla*, 921 S.W.2d 723, 726 (Tex. App.—Corpus Christi 1996, writ denied); *Muller v. Leyendecker*, 697 S.W.2d 668, 675 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.).

identity—evidence that a reasonable factfinder could not have disregarded. We sustain Augillard's first issue.

While we also agree with Augillard that the evidence is factually insufficient to support the judgment, because of our disposition of her first issue, we need not reach her second.**[15]**

## CONCLUSION

Because we hold that the evidence is legally insufficient to support the judgment of the trial court, we reverse and render judgment in favor of Augillard.

---

**[15]** We also note the obvious dissonance between the emotional investment at the heart of the human-pet relationship and the current legal system, which identifies this eleven-year-old cocker spaniel with chronic health problems as "property," subject to suit for conversion and identified in terms of her economic worth. Given the parties' considerable expenditure in this case, it goes without saying that Jazz's significance as a cherished member of Augillard's family—as well as her importance to her caretakers of almost three years, Tiffany Madura and Richard Toro—far exceeds her market value. Thus, while resolving this appeal in accordance with the applicable law governing ownership of chattel, we recognize that there are important non-economic interests at stake in this case. As one commentator has remarked,

> People do not plan memorial services, or invest in serious medical treatment for their books or lawnmowers. They don't plan to pay more in insurance premiums than the purchase price or replacement cost of the property they seek to protect. Individuals do not leave money for their bicycles in their wills, or seek visitation arrangements for their televisions upon the termination of their marriages.

Kathy Hessler, *Mediating Animal Law Matters*, 2 J. Animal L. & Ethics 21, 28 (2007).

_____

Diane M. Henson, Justice

Before Justices Patterson, Puryear and Henson;
      Concurring Opinion by Justice Patterson

Reversed and Rendered

Filed:   June 20, 2008

17