**Reversed and Remanded and Majority and Dissenting Opinions filed December 14, 2021.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-20-00094-CV

---

## KRISTEN C. HITCHCOCK TAKARA, AS REPRESENTATIVE AND INDEPENDENT ADMINISTRATIX OF THE ESTATE OF REUBEN BLAIR HITCHCOCK, Appellant

### V.

### ANDREW JACKSON, Appellee

---

**On Appeal from the 20th District Court**
**Milam County, Texas**
**Trial Court Cause No. CV39023**

---

## MAJORITY OPINION

Appellant Kristen C. Hitchcock Takara, as representative and independent administrator of the estate of Reuben Blair Hitchcock, sued appellee Andrew Jackson and asserted a negligence claim stemming from Hitchcock's death following a tree-trimming accident. The parties proceeded to trial and the jury found neither Jackson nor Hitchcock negligent with respect to the occurrence.

Takara appealed and asserts that (1) the jury's no negligence finding is not supported by sufficient evidence, and (2) the trial court erred by denying her motion to exclude a witness. For the reasons below, we reverse the trial court's judgment and remand for a new trial.[1]

## BACKGROUND

On April 30, 2018, Jackson hired Hitchcock to trim a tree at his ranch. To perform the job, Hitchcock stood in the raised front-end loader of Jackson's tractor to cut the tree limbs. The front-end loader was lifted approximately 12-14 feet off the ground when Hitchcock fell onto the ground below. Hitchcock went to the hospital that evening with injuries from the fall and died approximately one month later.

Hitchcock's sister, Takara, sued Jackson for negligence. Alleging that Jackson was aware that Hitchcock had limited physical and intellectual capabilities, Takara asserted that Jackson failed to exercise ordinary care by lifting Hitchcock in his tractor's front-end loader to trim a tree.

The parties proceeded to a jury trial in September 2019. After the close of evidence, the jury returned a verdict finding that neither Jackson nor Hitchcock were negligent with respect to Hitchcock's fall. Takara timely appealed.

## ANALYSIS

In two issues, Takara asserts that (1) the jury's no negligence finding is not supported by legally and factually sufficient evidence, and (2) the trial court erred by denying Takara's motion to exclude a witness. We analyze these issues below,

---

[1] This case was transferred to this court from the Third Court of Appeals by Texas Supreme Court Transfer Order. Because of the transfer, we must decide the case in accordance with the precedent of the Third Court of Appeals if our decision otherwise would have been inconsistent with that court's precedent. *See* Tex. R. App. P. 41.3.

2

beginning with Takara's sufficiency challenge. *See* Tex. R. App. P. 43.3; *see also Kamat v. Prakash*, 420 S.W.3d 890, 898 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("We generally address first those points that, if sustained, would require us to reverse and render judgment rather than to reverse and remand.").

## I.    Sufficiency of the Evidence

### A.    Standards of Review

When a party attacks the legal sufficiency of an adverse finding on an issue on which she had the burden of proof, she must show on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam); *Augillard v. Madura*, 257 S.W.3d 494, 500 (Tex. App.—Austin 2008, no pet.). In reviewing a legal sufficiency challenge, the court must first examine the record for evidence that supports the finding while ignoring all evidence to the contrary. *Dow Chem. Co.*, 46 S.W.3d at 241. If there is no evidence to support the finding, the reviewing court then examines the entire record to determine if the contrary proposition is established as a matter of law. *Id.* "The point of error should be sustained only if the contrary proposition is conclusively established." *Id.*

When a party attacks the factual sufficiency of an adverse finding on which she bore the burden of proof, she must establish that the finding is against the great weight and preponderance of the evidence. *Id.* at 242; *City of Austin v. Chandler*, 428 S.W.3d 398, 407-08 (Tex. App.—Austin 2014, no pet.). In reviewing a factual sufficiency challenge, we examine the entire record and consider both the evidence in favor of and contrary to the challenged finding. *Dow Chem. Co.*, 46 S.W.3d at 242; *City of Austin*, 428 S.W.3d at 407. We set aside a verdict "only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Dow Chem.*

3

*Co.*, 46 S.W.3d at 242.  For this determination, we do not pass judgment upon the witnesses' credibility or substitute our judgment for that of the factfinder, even if the evidence would support a different result.  *City of Austin*, 428 S.W.3d at 407.

### B.    Evidence

Takara was the first witness to testify at trial.  According to Takara, Hitchcock was 52 years old when he died.  Takara said she had seen Hitchcock approximately three-to-five times in the ten years preceding his death.

Takara testified that Hitchcock was intellectually disabled and could not read or write sentences.  Takara said Hitchcock did not graduate from high school but instead received a "certificate of attendance that he had attended all 12 years of school."  Takara testified that Hitchcock was enrolled in special needs classes.  Takara recalled that, after high school, Hitchcock primarily worked at manual labor jobs.

At the time of the accident, Takara testified that Hitchcock was living in a trailer with approximately 40 dogs.  For water and electricity, Takara said Hitchcock relied on a water hose and an extension cord.  Takara acknowledged that Hitchcock had a driver's license but said he used a riding lawnmower as his primary mode of transportation.

Takara said Hitchcock was hit by a car in April 2009 while he was riding his bike.  Takara testified that the accident "shattered" Hitchcock's pelvis "to the point that they had to use mesh to hold it together."  According to Takara, Hitchcock's leg "rebroke a couple of times to the point that about a year prior to his death, they were thinking about having it amputated."  Takara testified that Hitchcock walked with a limp and would use a cane or a crutch to get around.  Takara said Hitchcock dealt with "chronic pain" and agreed that he would have "[g]ood days and bad

4

days."

Takara said she received a phone call on May 1, 2018, informing her that Hitchcock had been admitted to the hospital the day before. Takara arrived the next day to see Hitchcock. According to Takara, Hitchcock's injuries included shattered ribs, a fractured back, a broken collarbone, kidney damage, and collapsed lungs. Takara said she spoke with Jackson about the tree-trimming incident and Jackson originally told her that Hitchcock fell from a three-foot height. Takara testified that Jackson later changed his story and told her that Hitchcock fell from a six-foot height.

Approximately one month after Hitchcock's fall, Takara said she made the decision to take Hitchcock off life support. When asked why she filed the underlying lawsuit on behalf of Hitchcock's estate, Takara stated: "Because I believe that Mr. Jackson took advantage of my brother and my brother's abilities, and he put my brother's life in danger. In fact, it cost my brother his life."

Dr. John Elwood, a clinical psychologist, was the second witness to testify at trial. Dr. Elwood evaluated Hitchcock in May 2009 when Hitchcock was applying for disability payments. According to Dr. Elwood, Hitchcock completed an IQ test and had a "full scale IQ score of 80", which put Hitchcock in "the bottom 10 percent of the population." On the working memory index, Dr. Elwood testified that Hitchcock received a score of 67, which placed him within the intellectually disabled range. Based on Hitchcock's performance on the word reading test, Dr. Elwood said Hitchcock was "functioning at a third-grade level." In sum, Dr. Elwood concluded that Hitchcock was not "a reliable informant" and that he evidenced "chronic judgment problems and . . . poor insight into his difficulties". Dr. Elwood also testified that Hitchcock had "persistent and fair concentration" and was "rational and coherent" with respect to "most topics".

5

Jackson testified at trial regarding his history with Hitchcock and the events that occurred the day of Hitchcock's fall. According to Jackson, he knew Hitchcock for "roughly six to eight years" and had previously hired Hitchcock "40, 50 times" to perform various jobs on his property, including weed eating, tree trimming, painting, splitting wood, and repairing water lines. Jackson said he had hired Hitchcock specifically to trim trees "15 times or so." Jackson testified that other people in the community also hired Hitchcock to trim their trees. According to Jackson, Hitchcock "knew a lot about trees and woodworking."

Jackson testified that Hitchcock would provide his own equipment when he came over to do work. Admitted during Jackson's testimony was a picture of Hitchcock's riding lawnmower pulling a small trailer. On the trailer was a sign that said "Country Boy Maintenance" and listed Hitchcock's phone number.

Jackson acknowledged that Hitchcock "had some limitations." Jackson said Hitchcock "could not read or write paragraphs, letters, but he could read and make out objects and he was definitely not stupid." Jackson recalled that Hitchcock would walk "with a considerable limp" and said Hitchcock "had his good days and bad days." Jackson said he had previously helped Hitchcock run errands around town and had given Hitchcock rides to the grocery store, the parts store, and to his doctor.

According to Jackson, he had "talked to [Hitchcock] about trimming this particular tree for months". Jackson recalled that, on the day of the incident, Hitchcock arrived at his house "unannounced" to trim the tree. Jackson said that Hitchcock seemed to be having a "good" day and that he "had a little bounce in his step." According to Jackson, he was planning to pay Hitchcock $20/hour for completing the job.

With respect to the job, Jackson testified:

6

> I asked [Hitchcock] since he was telling — it was his job, what would [be] the best way to do it? And [Hitchcock] looked at the tree, there were no lower limbs for him to crawl up on or anything. He said, the best way to do this would be for you to raise me up in the [tractor] bucket and let me cut the limb.

According to Jackson, he went to get the tractor and Hitchcock "showed [him] where to position it." Jackson testified that Hitchcock got in the tractor front-end loader with his chainsaw and Jackson raised the loader up approximately 10 feet. Jackson said he got out of the tractor to get Hitchcock some rope and, while Hitchcock was fastening the rope around a tree limb, Hitchcock fell to the ground. Jackson testified he did not see Hitchcock fall but saw him hit the ground.

Jackson said he "ran over to [Hitchcock] and helped him get up on one knee and get his — regain his breath." Jackson testified that Hitchcock "proceeded to smoke a cigarette and relax" for a few minutes before moving to sit down in a chair. Jackson recalled that Hitchcock sat there for about 20 minutes and "said he had a little pain". Jackson said Hitchcock eventually drove back to his trailer on his riding lawnmower.

Jackson testified that he was aware that his tractor had certain warning stickers, one of which said: "Warning. To avoid injury from falls, do not work from or allow riders on loader or its attachments." Jackson also acknowledged that the warning sticker showed a person falling out of a raised front-end loader. According to Jackson, he and Hitchcock previously had used the tractor front-end loader as a work platform to trim trees. Jackson said he and his son-in-law had also done work from the tractor's front-end loader. Jackson testified that he had previously "seen other people in [the] community using a front-end loader as a work platform".

Valerie McElwrath was the last witness to testify at trial. McElwrath said

7

Hitchcock had lived on her parents' property since 2014. McElwrath testified that she had known Hitchcock for approximately 15 years before his death and that she had seen Hitchcock "[q]uite a bit over the last four or five years." According to McElwrath, her father let Hitchcock live on the family's property because Hitchcock "literally had nowhere else to go."

McElwrath testified that Hitchcock "was very capable [and] functional. He took well care of all of his tools and great pride in them." McElwrath said she had previously worked with Hitchcock while building fences and cutting lumber. McElwrath described Hitchcock as "very mechanically inclined" and said he was "good" at trimming trees.

McElwrath testified that she had previously seen people working out of a tractor's front-end loader and described the practice as "pretty common." McElwrath also said she had conversed with Hitchcock regarding his "policy" for using a front-end loader as a work platform. According to McElwrath, Hitchcock told her "he didn't have a fear of working in a front-end loader, that he would always make whoever was on the tractor get off so there wouldn't be an operator error. So he felt very comfortable doing that."

### C. Application

We measure the sufficiency of the evidence by the charge submitted to the jury. *See Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145, 161 (Tex. App.—Austin 2017, pet. denied). Here, the jury was instructed as follows with respect to Takara's negligence claim:

<u>**Special Instructions**</u>

You are instructed that "negligence" means failure to use ordinary care, that is, failing to do that which a person or company of ordinary

8

prudence would have done under the same or similar circumstances or doing that which a person or company of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person or company of ordinary prudence under the same or similar circumstances.

"Proximate cause" means a cause that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence.

**Question 1:**

Did the negligence, if any, of those named below proximately cause the occurrence in question?

Answer "Yes" or "No" for each of the following:

1.  Andy Jackson              _____

2.  Ben Hitchcock             _____

The jury responded "No" for both Jackson and Hitchcock.

The elements of a negligence claim are a legal duty, a breach of that duty, and damages proximately caused by the breach. *Long Canyon Phase II & III Homeowners Ass'n, Inc. v. Cashion*, 517 S.W.3d 212, 223 (Tex. App.—Austin 2017, no pet.). With respect to Jackson, Question No. 1 submitted two elements of the negligence claim: whether Jackson breached his duty to use ordinary care and whether that breach proximately caused the occurrence in question. Accordingly, we may affirm the jury's no negligence finding as to Jackson if sufficient evidence supports its "No" response with respect to either of these elements.

We presume without deciding that Jackson's actions preceding Hitchcock's fall constitute negligence. We conclude that legally and factually sufficient

9

evidence supports the jury's finding that this negligence did not proximately cause the occurrence in question.

For our legal sufficiency analysis, we begin by examining the record for any evidence that supports the challenged finding while ignoring all evidence to the contrary. *Dow Chem. Co.*, 46 S.W.3d at 241. Here, the record contains evidence supporting the jury's finding that Jackson's actions were not a substantial factor in bringing about Hitchcock's fall. With respect to the tree trimming job, Jackson testified that he asked Hitchcock "what would [be] the best way to do it?" According to Jackson, Hitchcock said "the best way to do this would be for [Jackson] to raise [Hitchcock] up in the [tractor] bucket and let [Hitchcock] cut the limb." Jackson said Hitchcock showed him where to position the tractor and Hitchcock climbed in the front-end loader with his chainsaw to complete the job. Jackson testified that he raised the front-end loader to approximately 10 feet. Jackson had turned away from the front-end loader prior to Hitchcock's fall. There were no witnesses and no testimony adduced regarding how Hitchcock fell to the ground.

The testimony presented at trial, considered with respect to the jury's no negligence finding, supports the conclusion that Hitchcock dictated how the tree trimming job would be undertaken and that Jackson's actions were not a substantial factor with respect to the way the work was performed and Hitchcock's subsequent fall.

Other evidence in the record also supports the conclusion that Hitchcock was the impetus with respect to the actions preceding his fall, *i.e.*, the use of the front-end loader as a work platform. Specifically, Jackson and McElwrath both testified that Hitchcock had significant experience performing maintenance jobs in the community, including tree trimming. According to Jackson, he had known

10

Hitchcock for approximately six to eight years and had hired Hitchcock 40-50 times to perform various jobs on his property. Jackson said he had hired Hitchcock to trim trees approximately 15 times and that other people in the community had retained Hitchcock for similar work. Also admitted during Jackson's testimony was a photograph of Hitchcock's riding lawnmower and attached trailer, which showed that Hitchcock advertised his services as "Country Boy Maintenance."

McElwrath testified that she knew Hitchcock for approximately 15 years and had seen him regularly in the four years preceding his death. McElwrath said that Hitchcock was "very capable [and] functional", "very mechanically inclined", and "good" at trimming trees. According to McElwrath, Hitchcock told her he was "comfortable" using a tractor's front-end loader as a work platform. Jackson's and McElwrath's testimony on this point, considered in conjunction with Jackson's testimony regarding what occurred on the day in question, supports the finding that Jackson's actions were not a substantial factor in bringing about Hitchcock's fall. Therefore, we overrule Takara's legal-sufficiency challenge with respect to the jury's no negligence finding.

For a factual-sufficiency challenge, we examine the entire record and consider both the evidence in favor of and contrary to the challenged finding. In her appellate brief, Takara focuses on two types of evidence contrary to the jury's no negligence finding: (1) evidence showing that Hitchcock was "severely physically and intellectually disabled", and (2) Jackson's testimony that he was aware of the tractor's warning stickers advising against using the front-end loader as a work platform and acknowledgment there was a "possibility" Hitchcock could be injured while working from the front-end loader.

But this evidence, considered together with the evidence favoring the challenged finding, does not show that the jury's no negligence finding "is clearly

11

wrong and unjust." *See id.* at 242. With respect to the first category of evidence, the jury heard conflicting evidence with respect to Hitchcock's physical and intellectual capabilities: Takara and Dr. Elwood testified that Hitchcock had significant limitations but, according to Jackson and McElwrath, Hitchcock had significant experience with various maintenance jobs, including tree trimming. The jury resolved this conflict by declining to make a negligence finding as to either Jackson or Hitchcock and we decline to revisit that judgment on appeal. *See City of Austin*, 428 S.W.3d at 407.

With respect to the evidence regarding the tractor's warning stickers, this evidence also does not show that the challenged finding is clearly wrong and unjust. The jury heard substantial evidence indicating that Hitchcock was proficient in tree trimming and made the pertinent decisions that precipitated his fall. Moreover, both Jackson and McElwrath testified that using a front-end loader as a work platform was a common practice in the community. Accordingly, this evidence does not establish that the challenged finding is against the great weight and preponderance of the evidence. We reject Takara's factual sufficiency challenge. We overrule Takara's first issue.

## II. Motion to Exclude a Witness

In her second issue, Takara asserts the trial court erred by denying her motion to exclude McElwrath's testimony, arguing that "[t]here was no mention of [McElwrath] testifying at trial until her name popped up two weeks before trial started on Jackson's amended, untimely Supplemental Response to Requests for Disclosure."

### A. Evidentiary Error

Under the former Rule 194.2(e), a party could request disclosure of the

12

name, address, and telephone number of any person with knowledge of relevant facts. *See* Tex. R. Civ. P. 194.2(e).[2] Parties have a duty to amend or supplement incomplete or incorrect responses to written discovery. *See* Tex. R. Civ. P. 193.5(a). If a party fails to timely make, amend, or supplement a discovery response, that party may not offer the testimony of a witness who was not timely identified unless the trial court finds that (1) good cause exists for the failure to timely make, amend, or supplement the response, or (2) the failure will not unfairly surprise or prejudice the other parties. Tex. R. Civ. P. 193.6(a); *Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 881 (Tex. 2009) (per curiam).

This rule is mandatory and the only permissible sanction for a violation — exclusion of the testimony — is automatic unless the trial court finds good cause or lack of unfair surprise or prejudice. *Norfolk S. Ry. Co. v. Bailey*, 92 S.W.3d 577, 581 (Tex. App.—Austin 2002, no pet.). The burden is on the proponent of the evidence to establish good cause or lack of unfair surprise or unfair prejudice. *Mid Continent Lift & Equip., LLC v. J. McNeill Pilot Car Serv.*, 537 S.W.3d 660, 671 (Tex. App.—Austin 2017, no pet.). A finding of lack of unfair surprise or unfair prejudice must be supported by the record. *Id*.

The determination of whether Jackson met his burden to negate unfair surprise and unfair prejudice was committed to the trial court's discretion; we review this decision for an abuse of discretion. *See id*. at 671-72. "The general test for abuse of discretion is whether the trial court acted without regard to any guiding rules or principles." *Id*.

---

[2] Effective January 1, 2021, the relevant rule is now Rule 194.2(b). Under the current rule 194.2(b), parties must disclose this information "[w]ithout awaiting a discovery request". Tex. R. Civ. P. 194.2(b)(5).

Here, after the jury heard testimony from Takara, Dr. Elwood, and Jackson, the trial court held a hearing on Takara's motion to exclude McElwrath's testimony. Takara's counsel argued that McElwrath's testimony should be excluded because (1) Jackson disclosed her as a witness only two weeks before trial; (2) the disclosure did not list McElwrath's address or phone number; and (3) Takara's counsel had been unable to get in contact with McElwrath before trial started.

In response, Jackson's counsel asserted that she and Takara's counsel "reached an agreement per his request to extend discovery closer than it usually would be to trial because [Takara's counsel] wanted to do the inspection" of Jackson's property. Jackson's counsel stated that McElwrath "was timely disclosed pursuant to [this] agreement."

Jackson's counsel also argued that Takara was "very much aware" of McElwrath and noted that, "[i]n the deposition of Ms. Takara, she brought [McElwrath] up multiple times." Takara also discussed McElwrath in her trial testimony and stated that, when Hitchcock was in the hospital following his fall at Jackson's property, Takara asked McElwrath to bring one of Hitchcock's dogs to the hospital to visit him. Takara also testified that she talked to McElwrath "multiple times throughout all of this."

Finally, Jackson's counsel pointed out that Takara was aware Hitchcock lived on McElwrath's parents' property. Jackson's counsel stated that, during Takara's inspection of Jackson's property, Takara and her attorney "went over to Mrs. McElwrath's house", which was located close to Hitchcock's trailer.

Ruling on Takara's motion, the trial court stated:

I think under the circumstances, [Takara] had reasonable notice of the possibility that [McElwrath] would testify. [Takara] was certainly

14

aware of [McElwrath] and her involvement with the decedent, and his capabilities are a big part of this case, and I think [McElwrath's] got relevant information with that.

The trial court denied Takara's motion to exclude.

Because the record does not support a finding of good cause or lack of unfair surprise or unfair prejudice with respect to the late disclosure of McElwrath, we conclude the trial court abused its discretion by permitting McElwrath to testify over Takara's objection. *See Mid Continent Lift & Equip., LLC*, 537 S.W.3d at 671.

First, at the hearing on Takara's motion to exclude, Jackson's counsel did not dispute that the disclosure of McElwrath as a witness was outside the parties' original discovery deadline. Rather, Jackson's counsel asserted that the parties had "reached an agreement . . . to extend discovery" and that McElwrath "was timely disclosed pursuant to [this] agreement."

Texas Rule of Civil Procedure 191.1 provides that, "except where specifically prohibited", parties may modify the "rules pertaining to discovery" by agreement. Tex. R. Civ. P. 191.1. To be enforceable, such an agreement must comply with the terms of Rule 11. *In re BP Prods. N. Am., Inc.*, 244 S.W.3d 840, 845-46 (Tex. 2008) (orig. proceeding); *see also Cunningham v. Columbia/St. David's Healthcare Sys., L.P.*, 185 S.W.3d 7, 12 n.5 (Tex. App.—Austin 2005, no pet.) (discussing Rule 11 agreements to extend discovery deadlines). Under Rule 11, "no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record." Tex. R. Civ. P. 11.

Aside from the statements from Jackson's counsel discussing the agreement,

15

there is no Rule-11-compliant evidence in the record to support a finding that the parties entered into an agreement to extend discovery deadlines. Without written and filed evidence of this agreement, it is not enforceable under the express wording of Rule 11. *See* Tex. R. Civ. P. 11; *In re BP Prods. N. Am., Inc.*, 244 S.W.3d at 845-46; *see also Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995) (analogizing Rule 11 agreements to the statute of frauds and requiring "a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings *without resorting to oral testimony*") (quoting *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978) (emphasis added)). Accordingly, the purported agreement between counsel to extend discovery deadlines does not support a finding that Takara would not be unfairly surprised or unfairly prejudiced by Jackson's late disclosure of McElwrath as a person with knowledge of relevant facts.

Second, Jackson's counsel stated at the hearing that the untimely disclosure of McElwrath would not surprise or prejudice Takara because, "[i]n the deposition of Ms. Takara, she brought [McElwrath] up multiple times." However, the record does not contain any portions of Takara's deposition in which she discussed McElwrath. Accordingly, these referenced deposition excerpts do not support a finding of lack of unfair surprise or unfair prejudice. *See, e.g., Miller v. Carter*, No. 05-11-00193-CV, 2012 WL 3679200, at *3 (Tex. App.—Dallas Aug. 28, 2012, pet. denied) (mem. op.) (where relevant deposition testimony was not included in the record, it would not support a finding of lack of unfair surprise or unfair prejudice). Even when we assume, however, that Takara mentioned McElwrath, the record remains devoid of evidence tending to show that Takara had notice that (1) Jackson considered her to be a person with knowledge of relevant

16

facts or (2) she needed to ascertain those relevant facts prior to trial.

Finally, the record contains two additional grounds Jackson argues support the trial court's decision to permit McElwrath to testify: (1) McElwrath had substantial involvement with Hitchcock and "saw [Hitchcock] all of the time", and (2) Takara was "very much aware" of McElwrath and mentioned McElwrath in her trial testimony. These bare bases do not satisfy Jackson's burden to show that McElwrath's untimely disclosure would not unfairly prejudice or unfairly surprise Takara.

During trial, Takara testified that McElwrath was "the daughter of the gentleman and lady whose property [Hitchcock] lived on." Takara said Hitchcock lived at that property for approximately five years; Takara testified that she had only visited Hitchcock once during that period of time. Discussing her prior interactions with McElwrath, Takara testified that she had not "had that many conversations" with her. While Hitchcock was in the hospital, Takara said she asked McElwrath to bring one of Hitchcock's dogs to visit him.

These limited interactions do not show Takara was aware that Jackson considered McElwrath to be a person with knowledge of relevant facts. Under the circumstances, Takara was deprived of the opportunity to conduct discovery and ascertain the nature of the relevant facts McElwrath knew. The deprivation of this opportunity is plainly apparent from the absence of McElwrath's name on Jackson's mandatory disclosures as a person with knowledge of at least one relevant fact. Takara's testimony on this point shows only that she was aware that McElwrath knew Hitchcock, knew he lived on her parents' property, and knew he loved dogs. Knowing a person exists (and knowing that person knows a decedent) reveals zero indicia said undisclosed person had knowledge of any fact relevant to litigation. It was Jackson's rule-imposed burden to reveal McElwrath had

17

knowledge of relevant facts (*e.g.*, Hitchcock's capabilities) and to establish the lack of unfair surprise or prejudice; he failed to do so, and McElwrath's undisclosed knowledge of relevant facts was then used against Takara. Accordingly, we conclude the trial court erred by permitting Jackson to call McElwrath as a witness over Takara's objection.

Further, Takara also was deprived of the opportunity normally afforded to parties to collect impeachment evidence against disclosed persons with knowledge of relevant facts because she did not know Jackson considered McElwrath to have relevant knowledge. Unlike our dissenting colleague, we see this as an exemplar of unfairness based on a violation of a mandatory duty imposed upon all parties under the Texas Rules of Civil Procedure. *See Veal v. CBREI/USA Hollister DST*, No. 14-16-00051-CV, 2017 WL 4080249, at *3 (Tex. App.—Houston [14th Dist.] Sept. 14, 2017, no pet.) (mem. op.) ("The salutary purpose of [this rule] is to require complete responses to discovery so as to promote responsible assessment of settlement and prevent trial by ambush.") (citing *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914 (Tex. 1992) (applying former rule 215(5), the predecessor to rule 193.6)).

Our dissenting colleague suggests that we should analyze this case as an insufficient designation as opposed to an untimely one. We disagree. Even if there was a Rule 11 agreement, Jackson's designation of McElwrath 16 days before trial deprived Takara of notice that Jackson considered her to be a person with knowledge of relevant facts until then. As a result, it was untimely. *See* Tex. R. Civ. P. 193.5(b)

## B. Harm

We turn now to determine whether the erroneously-admitted testimony harmed Takara.

18

"Erroneous admission of evidence is harmless unless the error probably (though not necessarily) caused rendition of an improper judgment." *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008) (citing Tex. R. App. P. 44.1); *see also In re A.R.M.*, 593 S.W.3d 358, 375 (Tex. App.—Dallas 2018, pet. denied) (mem. op.) (applying this standard in the context of a Rule 193.6 objection); *Nealy v. Southlawn Palms Apartments*, 196 S.W.3d 386, 395 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (same). In other words, the complaining party generally must show that the judgment turns on the particular evidence admitted. *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

We review the entire record in making this determination. *Id*.; *see also Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 352 (Tex. App.—Austin 2002, pet. denied). A judgment ordinarily will not be reversed for erroneous rulings on the admissibility of evidence when the evidence in question is cumulative or not controlling on a material issue dispositive to the case. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989); *see also S.C. v. Tex. Dep't of Family & Protective Servs.*, No. 03-20-00039-CV, 2020 WL 3892796, at *10 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.) ("[i]f the challenged evidence is cumulative of other unchallenged, admitted evidence, then admitting the challenged evidence was harmless").

As discussed above, McElwrath was the last witness to testify at trial and we presume her placement at the end was strategic rather than accidental. McElwrath said she had known Hitchcock for approximately 15 years and had seen him frequently in the five years preceding his death. McElwrath testified that she previously had worked with Hitchcock while building fences and cutting lumber. Perhaps most important, McElwrath testified Hitchcock was "very capable [and] functional", "very mechanically inclined", and fine with using a front-end loader as

a work platform.

Considered in light of the record as a whole, we conclude the admission of McElwrath's testimony probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1. Hitchcock's physical and mental capabilities were central issues at trial and repeatedly emphasized by the parties. During Takara's opening statement, her counsel made repeated statements addressing these issues:

- "This case is about Andrew Jackson taking advantage of [Hitchcock]" . . . "[b]ecause of [Hitchcock's] profound mental and physical disabilities."

- "Hitchcock couldn't read, he couldn't write, [] he had difficulty interacting socially with members of the community, [and] he walked with a limp."

- Hitchcock "was very vulnerable on April the 30th of 2018. He was the last person who should have been in a bucket truck, particularly without any safety equipment or any prior training on how to trim a tree."

These statements regarding Hitchcock's capabilities were immediately rebutted in Jackson's opening statement:

- "[T]he facts are going to show that [Hitchcock] was not nearly as disabled or mentally incompetent as [Takara] would like you to believe."

- "There were difficult parts about [Hitchcock], I don't think anyone will deny that. But he was a capable person."

- Hitchcock "was a skilled person. He knew how to do various things, build things, take things apart, trim trees. And more importantly, he was a fiercely independent individual who wanted to stand on his own two feet."

- "There will be testimony, I believe, from both sides that [Hitchcock] had good days and bad days. Some days he was capable of doing some things and other days he wasn't."

Likewise, the evidence addressing Hitchcock's capabilities was repeatedly

20

referenced in the parties' closing statements.

Takara, Dr. Elwood, and Jackson each testified at length about their opinions regarding Hitchcock's physical and mental capabilities. According to Takara and Dr. Elwood, Hitchcock had significant limitations — but Jackson said Hitchcock had significant experience with various maintenance jobs, including tree trimming, and was the driving force with respect to how the work was to be completed.

Against this backdrop, McElwrath's testimony was probably critical to the jury's liability determination. Aside from Dr. Elwood, McElwrath was the only non-interested witness to testify regarding Hitchcock's capabilities. And unlike Dr. Elwood, who last saw Hitchcock approximately nine years before his accident, McElwrath testified that she had seen Hitchcock "[q]uite a bit over the last four or five years."

Moreover, McElwrath specifically testified regarding Hitchcock's "policy" of using a front-end loader as a work platform — evidence provided on Jackson's behalf that Takara had no reason to discover before trial; this material information was not offered at any other point in trial. According to McElwrath, Hitchcock told her "he didn't have a fear of working in a front-end loader, that he would always make whoever was on the tractor get off so there wouldn't be an operator error. So he felt very comfortable doing that." There is no evidence in the record showing Takara had any notice McElwrath possessed any relevant knowledge on this important point. Based on these considerations, we conclude the trial court's error in admitting McElwrath's testimony probably did cause the rendition of an improper judgment in this case. *See* Tex. R. App. P. 44.1; *see also Brewer v. Isom*, 704 S.W.2d 911, 912 (Tex. App.—Dallas 1986, no writ) (error in admitting "non-cumulative evidence [] from the only unpaid, non-interested witness in the case" was prejudicial, warranting a new trial).

Our dissenting colleague suggests that Takara knew McElwrath knew "relevant facts about Hitchcock, including where he lived, how he lived on her parents' property, his condition at the hospital and his love of dogs." Again, we disagree. None of the aforementioned facts are relevant to the instant dispute; as a result, *Brunelle v. TXVT Ltd. P'ship*, 198 S.W.3d 476, 479 (Tex. App.—Dallas 2006, no pet.), is readily distinguishable. Instead, the relevant facts were that McElwrath had seen people working out of front-end loaders and that Hitchcock was comfortable using one. There is no evidence Takara knew these facts at any time before trial. Therefore, Jackson's untimely disclosure was harmful.

We sustain Takara's second issue.

## CONCLUSION

We reverse the trial court's October 9, 2019 final judgment and remand the case to the trial court for a new trial.

/s/    Meagan Hassan
        Justice

Panel consists of Chief Justice Christopher and Justices Hassan and Poissant (Christopher, C.J., dissenting).